729 So.2d 1085 (1999)
Susan ARMAND, Individually and On Behalf of her Minor Son, Derek Armand
v.
STATE of Louisiana, DEPARTMENT OF HEALTH AND HUMAN RESOURCES, and Earl K. Long Memorial Hospital, et al.
No. 97 CA 2958.
Court of Appeal of Louisiana, First Circuit.
February 23, 1999.
Writ Denied May 14, 1999.
*1086 Leonard Fuhrer, John E. Morton, Alexandria, LA, for Plaintiffs-Appellees Susan Armand, et al.
Richard P. Ieyoub, Baton Rouge, LA, Attorney General on behalf of the State of Louisiana, et al., Defendants-Appellants.
BEFORE: FIZSIMMONS and GUIDRY, JJ., and REMY CHIASSON, J. Pro Tem.[1]
GUIDRY, J.
In this medical malpractice action, defendants, State of Louisiana, through the Department of Health and Human Resources and Earl K. Long Memorial Hospital (EKL), appeal the trial court's judgment awarding damages in favor of the plaintiff, Susan Armand, individually, and on behalf of her minor son, Derek Armand.

FACTS
On October 5, 1988, Derek Armand (Derek), a six-year old in good health, became nauseous, disoriented and his temperature was 104 degrees. Susan Armand (Mrs. Armand) took her son, Derek, to the emergency room at EKL in Baton Rouge, Louisiana, for treatment of his condition. Mrs. Armand and Derek arrived at EKL on October 5, 1988, at approximately 9:10 p.m. When Derek arrived at the hospital, his temperature had dropped from 104 degrees to 101.5 degrees. Dr. Clifford N. Milligan, a family practice resident who was doing his emergency room rotation, was on call that night. Dr. Milligan examined Derek and conducted x-rays and other tests. In addition, Dr. Stephen G. Smith, a second-year general surgical resident, was contacted by Dr. Milligan to evaluate Derek in connection with complaints of abdominal pain to rule out the possibility of appendicitis. After Dr. Smith determined that Derek was not a surgical candidate, Derek was sent home at approximately 11:30 p.m. that night with a diagnosis as possibly having viral gastroenteritis, a minor illness. The mother was instructed to administer children's Tylenol to reduce fever, to encourage fluids, and to return to the emergency room if Derek's symptoms became worse during the night.
According to the medical policies and procedures established by EKL, when a patient under the age of sixteen is brought to the emergency room, the emergency room physician should consult the pediatric on-call team to evaluate a patient presenting with medical and/or surgical conditions requiring specialty consultation. In this case, both Dr. Smith and Dr. Milligan testified that they did not recall whether such a policy was in place at EKL on October 5, 1988.
*1087 Later that night, Derek's condition worsened. Mrs. Armand returned Derek to the emergency room on the morning of October 6, 1988, at approximately 6:42 a.m. Upon returning, Derek was reported as having a fever of 104 degrees, congestion, and numerous "spots" over his trunk and back. Mrs. Armand stated that her son was suffering from nausea, vomiting, and diarrhea. She also noted that Derek was disoriented at 5:00 a.m., with fixed visual gaze, dilated pupils, and a generalized rash over his body. Derek was diagnosed with fulminant meningococcemia and admitted to the hospital. Derek was treated with antibiotics, but his condition quickly deteriorated over the next few days. Derek was placed in the pediatric intensive care unit due to the severity of his illness. Later, Derek was moved to Our Lady of the Lake Regional Medical Center (OLOL) where his condition was monitored. Eventually, the doctors at OLOL amputated both of Derek's legs and two fingers on his right hand in order to save his life.

PROCEDURAL HISTORY
On March 7, 1991, Mrs. Armand, individually and on behalf of her son, Derek Armand, filed suit against the State of Louisiana, Department of Health and Human Resources, Earl K. Long Hospital, Dr. Milligan, and Dr. Smith, based on treatment rendered to Derek at EKL on October 5, 1988.[2]
The petition contained several allegations of negligence, which included: the failure to render timely and appropriate emergency care and/or diagnostic services required under the circumstances; the failure to render all appropriate care and treatment on a timely basis; the failure to safely monitor Derek's condition and/or to cause such safe monitoring to occur; the failure to recognize, report and properly treat the dangerous infectious conditions; the failure to properly and timely evaluate the x-rays; the failure to institute, follow and/or carry out proper emergency standards, rules, tests and examination procedures for a patient with the symptoms and signs of Derek; the failure to institute proper emergency room rules, regulations and standards; the failure to enforce such standards; the failure to properly train personnel; the failure to admit Derek; and the failure to advise, inform and educate Drs. Milligan and Smith of pertinent hospital policies and procedures. As a second cause of action, plaintiff alleged that provisions of LSA-R.S. 40:1299.39, et seq., and LSA-R.S. 13:5101, et seq. and other statutes restricting her rights to recover full damages were unconstitutional.
On September 15, 1997, this case was heard on the merits. On September 29, 1997, the trial judge ruled in favor of the plaintiff and issued oral reasons for judgment. Pursuant to the ruling, the lower court awarded general damages of $4,000,000.00 to Derek Amand, loss of consortium damages of $750,000.00 to Susan Armand, past medical expenses of $171,934.94, home improvement expenses of $5,061 .00, medical travel expenses of $2,449.98, discounted future medical expenses of $1,774,633.00, and discounted impairment of earning capacity for $225,905.00. Final judgment was signed on October 14, 1997.
In its ruling, the district court found EKL guilty of "administrative negligence." In addition, the court found that the $500,000.00 cap on damages did not apply to the case at bar. Moreover, the district court determined that the negligence occurred prior to the September 1988 amendments to LSA-R.S. 40:1299.39. Under the amendments, the statutory cap provisions regarding medical treatment were extended to hospitals, boards and other agencies. Previously, the statute only applied to medical professionals and health care providers.
Defendants, State of Louisiana, Department of Health and Human Resources, and EKL, have taken a suspensive appeal from the court's ruling.

ASSIGNMENTS OF ERROR
Defendants assert the following assignments of error on appeal:
*1088 1. The lower court erred in holding that the teaching policy of the hospital created a duty owed to the patients and that breach of that policy was a breach of a duty owed to a patient;
2. The lower court erred in finding that a pediatric consult during the initial visit on October 5, 1988 would have made any difference in the outcome of the matter;
3. The lower court erred in not recognizing that this is a loss of chance matter;
4. The lower court erred in evaluating Derek Armand as a quadriplegic;
5. The lower court erred in awarding Mrs. Armand any amount in her individual capacity; and
6. The lower court erred in failing to apply LSA-R.S. 40:1299.39 as amended in 1988 which eliminated the so-called Sibley "administrative fault" exception to the statute.

DISCUSSION

A. Hospital's Duty
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect the patient from the dangers that may result from the patient's physical and mental incapacity as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974); Sibley v. Board of Supervisors of Louisiana State University (Sibley II), 490 So.2d 307, 311 (La.App. 1st Cir.), writ denied, 496 So.2d 325 (La.1986).
To this end, hospitals have internal regulations, set certain policies, and maintain a system of committees, each monitoring a different aspect of the hospital. Sibley II, 490 So.2d at 312. In the case sub judice, EKL has established policies and procedures that involve the medical care of patients, specifically patients under the age of sixteen that are admitted to the emergency room. The record contains specific testimony from hospital personnel that the policies and procedures at issue were for the benefit of not only the residents but also the patients.

B. Administrative negligence
Prior to the 1988 amendments of LSA-R.S. 40:1299.39(A)(4) and (B) in Act 786, Louisiana courts arguably allowed for a cause of action under the theory of administrative negligence. This issue was discussed by the Louisiana Supreme Court for the first time in Sibley v. Board of Supervisors of Louisiana State University (Sibley I), 477 So.2d 1094 (La.1985). In Sibley I, the supreme court held that LSA-R.S. 40:1299.39, which limits medical malpractice awards against the state to $500,000.00, does not limit a malpractice judgment based on a state hospital board's own negligence apart from any fault of physicians or other health care personnel. Sibley I, 477 So.2d at 1099.
Our courts have formulated duties of care on an individual basis to determine when a hospital's governing body is responsible for its own acts or omissions which cause injury to a patient. Sibley I, 477 So.2d at 1099. Examples include: the governing board's duty to select its employees with reasonable care, Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969), overruled on other grounds by, Garlington v. Kingsley, 289 So.2d 88 (La.1974); the board's duty to furnish the hospital with reasonably adequate supplies, equipment and facilities for use in treatment and diagnosis of patients; Snipes v. Southern Baptist Hospital, 243 So.2d 298 (La.App. 4th Cir.1971); Lauro v. Travelers Ins. Co., 261 So.2d 261 (La.App. 4th Cir.), writ denied, 262 La. 188, 262 So.2d 787 (1972); and a duty to provide adequate procedures for maintenance and safety of its grounds and buildings, Head v. St. Paul Fire & Marine Ins. Co., 408 So.2d 1174 (La.App. 3d Cir.), writ denied, 412 So.2d 99 (La.1982); Roark v. St. Paul Fire & Marine Ins. Co., 415 So.2d 295 (La.App. 2d Cir.), writ denied, 416 So.2d 557 (La.1982). A breach of one of the above listed duties or a similar duty which causes injury to the patient may constitute independent negligence of a hospital's governing board even in the absence of any *1089 finding of negligent conduct by an employee. Sibley I, 477 So.2d at 1099. Alternatively, a hospital may be required to answer for the negligence of its employees, even though no negligence is proved against its governing board. Sibley I, 477 So.2d at 1099.
These fundamental principles establish a framework for tort responsibility in Louisiana which must be examined before determining whether the legislature intended that the statutory limitation for malpractice should apply independently to the state for its own acts or omissions. Sibley I, 477 So.2d at 1099-1100. These principles are equally applicable to the state, a state agency or a political subdivision.
Under LSA-R.S. 40:1299.39, the statute's primary focus is on insuring an adequate supply of physicians and other health care professionals. To accomplish this worthwhile goal, the legislature has prohibited judgments in excess of $500,000.00 exclusive of medical expenses. Sibley I, 477 So.2d at 1100.
Prior to the September 1988 amendments to LSA-R.S. 40:1299.39, the act only limited liability for negligence based on the acts or omissions of physicians and other professionals providing health care services. However, in the September 1988 amendments to LSA-R.S. 40:1299, the legislature closed the window on recovery for medical malpractice caused by administrative negligence. The legislature accomplished this by broadening the definitions of "malpractice" and "health care" so that LSA-R.S. 40:1299.39 would extend to cover all acts associated with medical treatment of a patient, whether those acts are performed by physicians or others in an administrative or managerial capacity.
The September 1988 amendments were due primarily in part to the decision made in the Sibley I case. In that case, the court held that a hospital governing board could be independently, administratively liable (negligent) respecting a patient. In Sibley I, the court ultimately found that institutional negligence did not exist under the facts of that case; however, the court's ruling left open the window for that theory of recovery. Moreover, in the court's decision, the court stated that if the legislature did not want to allow for a theory such as "administrative negligence" against a hospital, governing board, or other agency, the legislature could have easily precluded such a theory by modifying the statute. The September 1988 amendments modified the statute to do away with theories of administrative negligence regarding medical treatment.
Mrs. Armand is correct in her assertions that Louisiana law recognizes various causes of action against hospitals that are outside the scope of medical malpractice acts. See, e.g., Hutchinson v. Patel, 93-2156 (La.5/23/94), 637 So.2d 415; Sewell v. Doctors Hospital, 600 So.2d 577 (La.1992). However, when the hospital's actions involve the treatment of a patient, they fall within the scope of the LSA-R.S. 40:1299.39 and are therefore subject to the medical malpractice statutory limitations.
In Sewell, the Louisiana Supreme Court suggested criteria for determining whether a theory of recovery against a healthcare provider is subject to the limitations of the state's medical malpractice acts. The two most important criteria are:
1) Whether the particular wrong is treatment related or caused by a dereliction of professional skill; and
2) Whether the wrong requires expert medical evidence to determine if the appropriate standard of medical care was breached.
This case is replete with medical evidence and expert testimony concerning whether the patient was properly diagnosed during his initial visit to the emergency room on October 5, 1988, and whether it was appropriate to seek approval of a pediatrician before releasing the patient. The appellees allege that this case involves the mere photocopying of the hospital's policies and distributing the policies to the doctors involved. We do not believe that the hospital's duties could be construed so simplistically.
The medical policy and procedures established by EKL involved the treatment of patients, i.e., release of patients under the age of sixteen after receiving a medical approval from a pediatrician. Therefore, the *1090 acts under the policy would relate to treatment and would therefore fall within the scope of LSA-R.S. 40:1299.39. In addition, EKL's policy at issue in this case is directed towards medical treatment. The policy states in pertinent part:
The emergency room physician should consult the pediatric on call team to evaluate all pediatric (birth through 16 years) patients presenting with medical and/or surgical conditions who require specialty consultation.
In the case sub judice, the policy in question specifically involved a pediatrician's medical approval of the release of a patient under sixteen years of age. Under these circumstances, we conclude that the hospital policy in question involved the medical care or treatment of the hospital's patients. Therefore, if the tortious act occurred after the effective date of the 1988 amendment, then this case is subject to the statutory cap of $500,000.00 under LSA-R.S. 40.1299.39(F).[3]

C. Time of Negligent Act
For that reason, we now address whether the negligence complained of occurred before or after the September 1998 amendments were passed. If the act of the hospital occurred before the September 1988 amendments, Derek Armand would have a cause of action for institutional negligence against EKL. On the other hand, if the act of failing to inform the residents occurred after the act was passed, then the hospital's actions would fall under the limitations set by the LSA-R.S. 40:1299.39.
We find that the latter is the case. The hospital treatment of Derek Armand began on October 5, 1988, when he first arrived at the hospital. Any negligence resulting from the hospital's failure to inform the residents that they needed to seek a pediatrician would have arisen on that date.
This court discussed the 1988 amendments of Louisiana Revised Statutes 40:1299.39 in Martino v. Sunrall, 619 So.2d 87 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La. 1993), and distinguished Sibley and other cases, which were decided prior to the 1988 amendments:
In general, La.R.S. 40:1299.39, termed the Public Medical Malpractice Statute, limits the liability of the State of Louisiana in malpractice cases to $500,000.00, other than liability for medical expenses. Sibley v. Bd. of Sup'rs of Louisiana State University, 477 So.2d 1094 (La.1985). In 1982, when the plaintiff's injury occurred, this legislation applied only to state-employed physicians and other professionals providing medical and related health care services. The Louisiana Supreme Court specifically held that the liability cap did not apply to judgments rendered against the State itself. Id. at 1104. In 1988, the legislature amended the statute to include in the definition of "person covered by this Part," the State and any of its departments, specifically including state hospitals.
Martino, 619 So.2d at 92.
Therefore, we conclude that the trial court erred in finding that this case involved administrative negligence to which the medical malpractice cap does not apply. In light of the changes in the law regarding medical malpractice, this case is subject to the statutory cap provided for in LSA-R.S. 40:1299.39.

Medical MalpracticeReview on Appeal
In Ferrell v. Fireman's Fund, 94-1252 (La.2/20/95), 650 So.2d 742, 747, the supreme court instructs courts of appeal that when legal error interdicts the fact-finding process, the appellate court should make its own independent de novo review to determine a preponderance of the evidence and enter whatever judgment is appropriate in the case. See also Smith v. Toys `R' Us, *1091 Inc., 97-1222 (La.App. 1st Cir. 6/30/98), 715 So.2d 1231, 1233 n. 7. In other words, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. Salassi v. State, Dept. of Public Safety and Corrections, Administrative Hearing Section, 96-0321 (La.App. 1st Cir. 11/15/96), 684 So.2d 1014, 1016. Therefore, because we have determined that the trial court erred in concluding that the medical malpractice act did not apply, we must review the present case de novo.
At trial, Ms. Armand testified that she left home with Derek for the hospital between 8:30 and 8:40 p.m. and arrived at EKL in about 10 minutes. According to Ms. Armand, when they arrived at the emergency room, she explained all of Derek's symptoms, which included high fever that had increased from 102 degrees to 104 degrees, chills, vomiting, and headache, to the woman at the admission desk and then waited until a nurse came out to see them. They were then taken into a room where the nurse checked Derek's temperature, pulse, and other vital signs and then sent them back to the waiting room. Fifteen or twenty minutes later, Ms. Armand was questioned regarding personal information. About an hour later, they were taken to the emergency care area to see the doctor.
According to Ms. Armand, she informed the doctor of all of Derek's symptoms as he examined Derek. She testified that Dr. Milligan examined Derek's eyes, ears, nose and mouth. He also felt Derek's throat. The doctor also listened to Derek's chest and back by sticking the stethoscope under Derek's shirt. According to Ms. Armand, Derek's clothing were never removed during the physical examination.
Ms. Armand further testified that Dr. Milligan then sent Derek for x-rays. After the x-rays were done, Dr. Milligan saw Derek again and informed Ms. Armand that the x-rays were normal. Ms. Armand stated that at this time, Dr. Milligan raised Derek's shirt and asked the child to show him where it hurt. Derek indicated his chest and stomach. Dr. Milligan then examined Derek's stomach. Suspecting possible appendicitis, Dr. Milligan contacted Dr. Smith for a surgical consult.
Dr. Smith examined Derek. He did not believe it was appendicitis. According to Ms. Armand, he instead believed it was some sort of viral infection. According to Dr. Smith, his records indicated that he believed Derek had gastroenteritis. After examining Derek, Dr. Smith prescribed Tylenol and informed Ms. Armand to bring Derek back to the hospital if his condition worsened. Ms. Armand and Derek left the hospital around 11:30 p.m. that night.
According to Ms. Armand, after she returned home, she put Derek in the bed to sleep with her so that she could observe him throughout the night. Some time later, she awoke because he was very warm. He then woke up with diarrhea. She began dressing herself and noticed that Derek was dazed and non-responsive. Also, as she dressed Derek, she noticed purple spots on Derek's body in his groin area and in his armpits. She called her fiancé, who arrived within minutes and drove them to the hospital.
Drs. Milligan and Smith, for the most part, did not recall the specifics of what happened on the night of October 5, 1988. However, based on Dr. Milligan's notes, he believed he performed an adequate examination to rule out the diseases on his differential diagnosis list. In particular, according to Dr. Milligan, because his examination revealed that Derek's neck was supple, he had no suspicion that Derek might have an infection of the central nervous system. Dr. Milligan testified that even after Dr. Smith diagnosed gastroenteritis, he (Dr. Milligan) still believed Derek had early appendicitis.
Several depositions of physicians' testimony regarding the issue of whether Drs. Milligan and Smith and EKL committed medical malpractice were introduced into evidence.
Dr. Vora, a board certified radiologist, was an assistant professor at EKL in 1988. Dr. Vora reviewed Derek's chest x-rays from October 5, 1988, on October 6, 1988. According *1092 to Dr. Vora, there were infiltrates, which she stated were the same as pneumonia, in both bases of the lungs.
Dr. Jonathan Forester, a family medicine practitioner who reviewed the x-rays in connection with this litigation, however, testified that he saw no discernible pneumonia on the x-rays. Furthermore, he did not believe there was a breach of the standard of medical care. Additionally, Dr. Joseph O. Smith, a board certified pediatrician and diagnostic radiologist, testified that the x-rays were normal and that Dr. Vora's reading of pneumonia was due to lack of experience.
Dr. Judith Fishbein, a board certified pediatrician and neonatalogist and a professor at EKL, testified regarding the policies and procedures of EKL. According to Dr. Fishbein, the purpose of the requirement that children in need of a specialty consult be seen by a pediatrician is to ensure that the pediatric residents have the opportunity to learn how to evaluate patients. She further explained the meaning of the rule as follows: if an emergency room patient in the pediatric age group needs a surgical consultation, then the pediatric on-call team must also be consulted by the emergency room physician. She stated that this procedure is mostly for the benefit of the residents, to allow them to consult with someone who has more knowledge, but it is also for the child's benefit. She further testified that "a pediatrician is the best primary care provider for a pediatric patient because they are more aware of developmental aspects of disease and are trained people to evaluate children, and their diseases are different depending on the age."
Dr. Fishbein also testified that if a child presents and meningococcemia is reasonably a part of her differential diagnosis, she would examine the child for a rash, examine the child for physical signs that may suggest an irritation of the meninges, look for physical signs such as high fever, debility, patient "just not looking well." If she really feels that the child has meningococcemia, she would admit the child, put him on antibiotics, do tests such as a CBC with a differential, spinal tap, latex agglutination. However, she stated that she did not know if the latex agglutination was commercially available at the time of Derek's illness. Dr. Fishbein did not believe that Dr. Milligan really believed this child had meningococcemia, and testified that the disease is very rare and hard to diagnose, particularly if the patient does not have a rash or petechia.[4]
Dr. Norman E. McSwain, a professor of surgery at Tulane and an attending surgeon at Charity Hospital in New Orleans, testified that he could only address the quality of care provided by Dr. Smith and not Dr. Milligan, because his area of specialty is surgery. From his review, he did not note any breach of the standard of care by Dr. Smith. When asked whether he would have recommended a pediatric consult, he testified that the decision of whether or not to consult with pediatrics was that of the emergency room physician. The surgical resident's role was that of surgical consultant to rule out whether the patient had a surgical abdomen.
Dr. McSwain further testified that he has had no experience diagnosing or treating meningococcemia since he finished medical school. Nevertheless, he testified that, had he examined Derek and suspected meningococcemia, he would have done a complete physical examination checking for petechia on the chest, abdomen, upper legs and groin.
According to Dr. William D. Hardin, a pediatric surgeon of Children's Hospital of Alabama, the early signs of meningitis[5] *1093 might include things like elevated temperature, lethargy, changes in sensorium, changes in level of activity, changes in white blood count, neck pain, neck spasms, and stiff neck.
Dr. Hardin affirmed that if Derek had been admitted on the evening of October 5, 1988, and treated with the antibiotics used to treat pneumonia, then it is likely that Derek would not have sustained tissue loss. However, he stated that he did not think that pneumonia was clinically proven. However, when asked, he admitted that he had not seen the x-rays reviewed by Dr. Vora at the time his deposition was taken.
Dr. Hardin further testified that he believes if Dr. Milligan did not undress Derek to perform the physical examination, then Dr. Milligan breached the standard of care in that regard. Dr. Hardin affirmed that in not undressing Derek, Dr. Milligan could have easily missed the early signs of the petechia, which appear as small pinpoint spots.
Dr. Charles Joiner, a defense expert witness who specializes in family practice medicine, testified that although there may have been some possible error on the part of the resident in not obtaining the pediatric consult, no standard of care was breached. This is because, in Dr. Joiner's opinion, the pediatric consult would have made no difference in the outcome of the case.
Dr. Russell Barrett Van Dyke of Tulane University School of Medicine, who specializes in pediatric infectious diseases, reviewed the treatment employed by Drs. Milligan and Smith in the emergency room when Derek presented on the night of October 5, 1988. According to Dr. Van Dyke, had Derek been admitted to the hospital on October 5, 1988, and received antibiotic treatment for pneumonia, it is very likely that Derek could have still sustained tissue loss, although it is possible that he would not have sustained any loss. There is probably a 60 percent likelihood that the outcome would have been different. Although Dr. Van Dyke did not think that a pediatric consult was necessary in this case, he testified that had he been consulted as a pediatrician in this case, he would have taken a more complete and thorough history to assist in diagnosing the patient. Additionally, when a physical exam is done of a child, the child should be examined for a rash to help diagnosing the child. Such an exam would include opening the shirt or taking off the t-shirt and, using good light, examining the chest, extremities, face, and pulling down the underwear to examine that area of the trunk also.
Dr. Van Dyke also reviewed the chest x-ray taken on October 5, 1988, and interpreted the x-ray as showing that the lungs were normal. He further testified that antibiotic treatment of the pneumonia would have been effective as against the meningococcemia. Drs. Hardin and Deppe agreed with this statement.
Dr. Yolanda Bourgeois, an attending emergency medicine physician at St. Joseph's Hospital in Houston, also reviewed the medical records associated with Derek's case to assess the level of care provided. According to Dr. Bourgeois, several errors were made in treatment. Specifically, Dr. Milligan violated the hospital's protocol in his failure to consult with the pediatrician or at least an attending physician to evaluate the patient. This is especially true in a teaching facility like EKL; because his history included vomiting several times, Derek should have been administered fluids to see if he could tolerate them before being released; and a CBC with differential should have been done.
Dr. Karen R. Williams is a pediatrician employed by Louisiana State University Medical Center at EKL. Dr. Williams concedes that the pediatric on-call team should have been called. Furthermore, she agreed that if there is any disagreement on whether to admit or not admit, discharge or not discharge, or the proper course of treatment, the pediatric staff should be involved. She also pointed out that a good physical examination is important, along with getting as much historical information as possible to see how rapidly evolving something is that is occurring.
According to Dr. Williams, when children present with fever, chills, vomiting, and diarrhea, generally this raises the index of suspicion and increases the likelihood that something bacterial is going on (however, a *1094 suspicion of meningococcemia generally only develops when the patient has a rash or the petechia).
Dr. Scott A. Deppe, who specializes in internal medicine and sub-specializes in critical care medicine, testified that in his experience, the purpose of policies and procedures such as those involved in the present case, are roadmaps for how to not only facilitate the efficient care of patients but also the safe care of patients. This is particularly true in hospitals where there are house staff in training. According to Dr. Deppe, because the policies and procedures of EKL were not followed in this case, there were errors in the diagnostic and treatment approaches. Dr. Deppe opined that were the policies and procedures followed, the resulting situation could possibly have been avoided.
Furthermore, Dr. Deppe pointed out that in a case where the patient has a high fever, a complete blood count (CBC) with a differential should be done. Also, according to Dr. Deppe, the x-rays were misread because the chest x-rays of October 5, 1988 show bilateral lower lobe infiltrates. Although Dr. Deppe is not a radiologist, he testified that in his practice, taking care of critically ill patients, he reads a lot of x-rays with and without a radiologist. An additional error in treatment, according to Dr. Deppe, is that the records indicate that Dr. Milligan did not examine Derek's skin, which is important if one is looking for some sort of infectious disease processes.
Finally, Dr. Herbert L. Dupont, who specializes in internal medicine and infectious diseases, also reviewed the medical records to evaluate the quality of care provided. According to Dr. Dupont, the three major breaches of the standard of care were the failure to consult with a pediatrician, who probably would have admitted Derek; the failure to consider meningococcemia as a possible problem in this case; and the failure of Dr. Milligan to properly read the chest x-rays, which in Dr. Dupont's opinion showed the presence of pneumonia in both bases of the lungs. According to Dr. Dupont, had the pneumonia been properly diagnosed, then the same antibiotics that would have been used to treat the pneumonia would have effectively treated the meningococcemia, and had antibiotics been administered that evening the amount of tissue loss would have been much less. Moreover, there would have been a greater than 50 percent chance of no tissue loss. Furthermore, Dr. Dupont testified that he did not believe Derek was properly examined to determine if petechia was present.
We believe the weight of the expert testimony introduced on the issue of medical malpractice demonstrates that EKL and Dr. Milligan are liable for medical malpractice. EKL failed to properly instruct the residents regarding the hospital's policies and procedures. Additionally, because these policies and procedures were in place, policies which Dr. Milligan admitted he probably received at the time he started his residency, Dr. Milligan's failure to comply with the hospital's policy requiring a pediatric consult, together with his failure to perform a complete physical examination, amounted to a breach of the standard of care for providing medical treatment. While the evidence is somewhat equivocal as to whether Derek had pneumonia, the weight of the evidence indicates that, had a pediatrician evaluated Derek's condition, it is more likely than not that the outcome could have been very different. A pediatrician, who is specially trained to evaluate and treat children, would most probably have been inclined to ask more specific questions in obtaining the patient history and more thorough in completing the physical examination.
Accordingly, the trial court's judgment in favor of Ms. Armand, on behalf of Derek, is amended to reduce the general damages award to $500,000.00 in accordance with the statutory cap, and the trial court's award of damages for loss of earning capacity is reversed.

Loss of Consortium Claim of Ms. Armand
In medical malpractice cases to which the statutory cap applies, the injured party can recover only one $500,000.00 cap for all malpractice claims. See Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709. This includes any derivative claims that arise from the same act of malpractice. Therefore, *1095 the trial court's award of $750,000.00 to Ms. Armand, individually, is reversed.

Supplemental Reasons
The trial court signed the judgment in this matter on October 14, 1997, and an order of suspensive appeal, without the necessity of furnishing security or costs, was signed on October 20, 1997. On October 17, 1997, counsel for the State of Louisiana, through the Department of Health and Hospitals and EKL filed a request for written reasons for judgment. The trial court signed what is titled "Written Reasons for Judgment" (the Written Reasons) on February 13, 1998.
On February 27, 1998, counsel for plaintiffs filed a motion with the trial court to supplement the appeal record with the Written Reasons. An order granting this motion was signed by the trial court on March 4, 1998. On February 17, 1998, the State of Louisiana, through the Department of Health and Human Resources, and EKL, filed a motion to strike the Written Reasons from the record on appeal. On July 1, 1998, the motion was referred to the merits.
Pursuant to LSA-C.C.P. art.2088, the jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal. Clearly, the matters discussed in the February 13, 1998 "Written Reasons for Judgment" are not reviewable under this appeal, which was granted on October 20, 1997. The granting of this appeal divested the trial court of jurisdiction. Thus, the trial court lacked jurisdiction to issue the Written Reasons and to order that the record on appeal be supplemented with the Written Reasons. Accordingly, the motion to strike filed by the State of Louisiana, through the Department of Health and Human Resources, and EKL, is granted.

CONCLUSION
For the foregoing reasons, the portion of the trial court's judgment in favor of Ms. Armand, on behalf of Derek, awarding general damages, is amended to reduce the award to $500,000.00. The loss of earning capacity award is reversed, and the portion of the trial court's judgment awarding $750,000.00 to Ms. Armand, individually, is reversed and judgment is rendered in favor of the state and EKL, dismissing Ms. Armand's individual claim against them. In all other respects, the judgment is affirmed. Costs of this appeal in the amount of $3,243.00 are assessed to appellants, the State of Louisiana, through the Department of Health and Human Resources and Earl K. Long Memorial Hospital. The motion to strike filed by the State of Louisiana, through the Department of Health and Human Resources and Earl K. Long Memorial Hospital is granted.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AMENDED IN PART, AND AS AMENDED, AFFIRMED IN PART; AND MOTION GRANTED.
FITZSIMMONS, J., dissents, and assigns reasons.
FITZSIMMONS, Judge, dissenting, with reasons.
The hospital appealed the trial court's finding that the hospital was negligent. After a de novo review, the majority finds the hospital, and Dr. Milligan, negligent. Based on a de novo or manifest error review, I can find no reasonable basis for a finding of negligence. For these reasons, I respectfully dissent.
The use of the word "should" in the hospital policy rendered it more aspirational, rather than mandatory under all circumstances. Additionally, the policy provided triggering conditions for a consult. Surgical or pediatric consults "should" be provided, not for all pediatric patients, but for those "presenting with medical and/or surgical conditions who require specialty consultation." The policy gave the attending physician the discretion to determine when such conditions were present and specialist consultations required. Emergency room admissions, by their very nature, do not always allow sufficient time for a consult. Thus, the existence of the policy, or failure to distribute the policy, does *1096 not always provide an independent basis for a duty owed to the patient, and a finding that the hospital was negligent.
The next inquiry becomes whether the hospital doctors abused their discretion, and failed to provide reasonable care, under the circumstances known or reasonably knowable to them at the time. Were the reasonably knowable conditions of the type to require a pediatric consult? If so, the next inquiry would be whether a pediatric consult on the first visit would have produced the correct diagnosis. If yes, the damages caused by the delay in diagnosis would be the next inquiry.
On first presentation, the symptoms were: a fever of 104 degrees that had lowered to 101.5 degrees, nausea, chills, and chest and stomach pain. Vital signs and a medical history were taken. Dr. Milligan examined the child, specifically the stomach area, because of the abdominal pain. The doctor ordered X-rays and a complete blood count, all of which he believed to be normal. A surgical consult was provided, because of the abdominal pain, to rule out appendicitis. The surgical resident also examined the abdomen, ribs, and shoulder areas. No finding of tell-tale red spots on the skin was noted by either physician. The mother was instructed to give Tylenol, encourage fluids, and to return, if the symptoms worsened. The mother returned approximately eight hours later. The correct diagnosis was made on the second visit, based on additional symptoms.
The medical testimony was equivocal. A pediatric consultant may have diagnosed the rare malady sooner, or not. A radiologist or a pediatrician may have found symptoms on the X-ray that may have led to earlier antibiotic treatment, or not. Earlier treatment with antibiotics may have retarded the progress of the disease, or not. However, those questions are premature. The first question must be whether the hospital's attending physician, Dr. Milligan, or the surgical consultant, provided reasonable care on the first visit, or did they breach the duty of care by failing to call for a pediatric consult.
In this particular case, the record, including the testimony of the medical experts, does not provide a reasonable factual basis for a finding that the hospital's physicians abused their discretion, and failed to give reasonable care on the child's first presentation at the hospital's emergency room. I would reverse the judgment of the trial court.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] On March 13, 1997, Ms. Armand filed a supplemental and amending petition, dismissing Drs. Milligan and Smith as defendants.
[3] LSA-R.S. 40:1299.39(F) provides, in pertinent part:

Notwithstanding any other provision of the law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of five hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of five hundred thousand dollars.
[4] Several of the medical experts described petechia as red pinpoint spots that usually appear on the extremities and trunk of the patient during the early stages of meningococcemia.
[5] Although there seems to be some disagreement in the expert testimony as to whether meningitis and meningococcemia are the same disease, Dr. Hardin testified that meningococcemia is a fairly advanced form of meningitis. He, however, later stated that they are different. According to Dr. Hardin, meningitis is an inflammation of the meninges of the brain, the lining of the brain. It could be viral, bacterial, or fungal, but is a localized disease. Whereas, meningococcemia is a generalized sepsis related to that organism. So, no longer is it contained in the central nervous system and cerebral spinal fluid and linings of the brain, but rather it is now disseminated and blood borne. So, basically, it is the blood borne dissemination of the disease, but still it is the basic underlying infection with the meningococcus organism.