United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 19, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 05-30197

_____

SAMUEL CLEVELAND, through his provisional curator, Bobbie
Jean Cleveland; BOBBIE JEAN CLEVELAND;

Plaintiffs - Appellants,

THERESA CLEVELAND

Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
For the Western District of Louisiana

_____

Before GARWOOD, DAVIS, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Samuel Cleveland, through his provisional curator, Bobbie Jean Cleveland ("Cleveland"),

appeals the district court's ruling in favor of the United States on claims of medical malpractice,

brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*[1] Cleveland challenges certain evidentiary rulings and the district court's final determination that she failed to prove that the defendant's conduct fell below the requisite standard of care.

I

Samuel sought admission to the emergency room at the Bayne Jones Army Community Hospital ("BJACH"), presenting with flu-like symptoms, a slightly elevated respiration rate, and a medical history of diabetes. Samuel was first seen by a triage nurse, who took his medical history and classified him as a "category four," a low priority patient. Samuel did not indicate that he had a prior history of serious medical conditions, including congestive heart failure, hypertension, and other chronic conditions, nor did he state that he was currently taking medications. Physician assistant George Eubanks ("Eubanks") then examined Samuel and concluded that he did not need a chest x-ray or other further tests. Eubanks diagnosed Samuel with an upper respiratory infection, bronchitis, and sinusitis, and prescribed a variety of medications: *Entex*, *Proventil*, and *Zithromax*. He then discharged him.

During the time Samuel was in the emergency room, Eubanks did not consult with an attending physician. Furthermore, Eubanks did not review Samuel's medical file, which contained his full medical history, including his prior congestive heart failure, until one hour after his discharge. After receiving and reviewing the file, Eubanks did not believe that the file indicated any reason to call Samuel back into the ER.

Two days later, Samuel returned to the ER. He was diagnosed with pneumonia resulting from

---

[1]     Because Samuel Cleveland has passed away, his wife, Bobbie Jean Cleveland, brought suit on his behalf. For clarity, we will refer to the Appellant as "Cleveland" and the decedent as "Samuel."

congestive heart failure. He eventually went into respiratory and cardiac arrest, became comatose, and remained so until his death several years later. Samuel's underlying condition of acute congestive heart failure led to his incapacitation and eventual death.

Samuel's wife brought suit against the United States under the FTCA, alleging medical malpractice. Cleveland asserts that the employees of the BJACH, specifically physician assistant Eubanks, failed to meet the requisite standard of care. She alleged that the employees of BJACH misinterpreted her husband's symptoms and thus misdiagnosed and mistreated the acute onset of congestive heart failure. She contends that had her husband been properly examined and treated when he was initially admitted to the emergency room, the doctors would have determined that he was suffering from acute congestive heart failure and could have prevented his eventual deterioration. To prove this failure, the expert witnesses who testified on Cleveland's behalf focused on the actions Eubanks took when diagnosing Samuel.

Wanda Poret ("Poret"), a certified legal nurse consultant, was prepared to testify on Cleveland's behalf that the BJACH employees deviated from the acceptable standard of care by neglecting to take a chest film and failing to diagnose congestive heart failure. In her report, she opined that had Samuel been treated for congestive heart failure on his initial visit, his subsequent deterioration could have been prevented. The United States objected to her admission as an expert witness, arguing that, as a nurse, she was not qualified to testify as to the standard of care owed by physician assistant Eubanks. The district court excluded her testimony without a written memorandum of reasons for the ruling.

Cleveland also proffered testimony by Dr. Jay Piland ("Dr. Piland"), who treated Samuel when he was transferred from the BJACH to the intensive care unit ("ICU") of Rapides Regional Medical

Center after he slipped into a coma. Dr. Piland is an internist who does not currently work in an emergency room setting.[2] Dr. Piland's testimony focused on Samuel's health after he was admitted to the ICU and on the medical conditions that resulted in Samuel's coma. During the course of Dr. Piland's deposition, Cleveland's attorney, over repeated objections by the United States, questioned whether Samuel was given the proper care when initially admitted to the emergency room at BJACH. Dr. Piland opined that when a patient presents with respiratory distress it is important to review a patient's full medical history so that the diagnosing physician is aware of any chronic conditions that the patient may have because respiratory distress may signal more significant medical problems, including congestive heart failure. He opined that in light of Samuel's pre-existing chronic conditions, which Eubanks would have learned from Samuel's medical records, Eubanks should have run further tests when Samuel presented with the upper respiratory infection, as his symptoms could have signaled a more serious underlying condition. Dr. Piland cautioned, however, that in his opinion, further testing would not necessarily have revealed the underlying heart failure.

Early in the bench trial, the United States moved to exclude Dr. Piland's expert testimony based on Cleveland's failure to provide a report prepared by Dr. Piland pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). The district court denied that motion, concluding that because he was a treating physician, Dr. Piland was excluded from the written report requirement. After Dr. Piland gave his deposition testimony, the United States reurged the motion to exclude, arguing that Dr. Piland was not qualified to testify as to the care and treatment of Samuel at the BJACH or to the relevant standard of care, as he was an internist and not an emergency room physician. Applying

---

[2]     During his deposition, he stated that he was a "moonlighter" in an emergency room during his residency, between 1994 and 1997.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), the district court concluded that although Dr. Piland was qualified as an expert in internal medicine, his testimony went beyond the scope of a treating physician and thus did not meet the *Daubert* test for reliability. The district court thus excluded Dr. Piland's testimony as to the standard of care in an emergency room.

Dr. Joe Rankin ("Dr. Rankin"), an expert in radiology, testified during his deposition about x-rays taken of Samuel's chest upon his second visit to the ER. Dr. Rankin had no role in Samuel's treatment. He stated that the chest x-rays indicated that Samuel's heart was enlarged and showed evidence of congested vasculature. Dr. Rankin testified that it was likely, judging from the size of the heart, that it had been enlarged two days before the film was obtained, i.e., on the day of Samuel's initial visit to the ER. This condition could have signaled a serious underlying heart condition, such as incipient heart failure. Cleveland's attorney also asked whether it was customary for a patient with a history of heart conditions to be x-rayed. Dr. Rankin answered that though he was not qualified to offer an opinion as to when a physician should order x-rays, in his experience people with histories of heart problems are x-rayed.

Cleveland also proffered an expert in internal medicine, Dr. Carlos Cuenca ("Dr. Cuenca").[3] Dr. Cuenca reviewed Samuel's medical records for the purposes of testifying at trial, but had no part in Samuel's treatment. Dr. Cuenca opined that when an individual with a history of congestive heart failure presents at the emergency room with an upper respiratory infection, that patient should have a chest x-ray, as the respiratory distress could be a signal for further heart problems. Dr. Cuenca

---

[3] During his deposition Dr. Cuenca noted that he had practiced emergency medicine for one year in the early 1970s.

suggested that because Eubanks was unaware of Samuel's full medical history, he failed to treat him adequately. He concluded that more aggressive treatment at the time of Samuel's initial visit to the emergency room could have prevented the eventual respiratory and cardiac arrest.

During the depositions of both Dr. Cuenca and Dr. Rankin, the attorney for the United States objected to questions that focused on the standard of care in an emergency room setting, stating that neither had been admitted as experts in emergency care. No formal ruling as to the testimony of Drs. Rankin and Cuenca was issued by the district court.

In its defense, the United States relied on the testimony of Dr. John McMillan ("Dr. McMillan"), who reviewed Samuel's medical file in preparation for testifying at trial. Dr. McMillan had practiced emergency medicine for 18 years and was proffered as an expert in that field. He concluded that physician assistant Eubanks did not deviate from the standard of care in an emergency room. He gave his opinion that Eubanks was correct to conclude that Samuel had an upper respiratory infection and treat him only for that condition. He disagreed with Cleveland's experts' opinions that a more extensive work-up should have been done, specifically rejecting the notion that a chest x-ray was medically indicated, and concluded that the treatment given Samuel for the upper respiratory infection was appropriate. Dr. McMillan also stated that it is not typical for the medical records of patients to be available when treated in an emergency room and that Eubanks' failure to consult them prior to treating Samuel was not a deviation from the standard of care.

After a bench trial, the district court found in favor of the United States. The district court first observed that Louisiana law requires that a plaintiff in a medical malpractice suit establish the applicable standard of care, a breach of that standard, and the causal connection between the breach and the injury. The district court further noted that if the relevant area of medicine is considered a

specialty, then the expert testimony must be from physicians with expertise in the specialty. The district court concluded that because none of Cleveland's witnesses were experts in the field of emergency medicine, Cleveland had failed to adduce testimony from an expert as to the applicable standard of care or a breach thereof. The district court noted that Drs. Rankin and Cuenca were not experts in the field of emergency medicine and furthermore, did not attempt to establish what the national standard of care was for specialists in the field of emergency medicine.

Cleveland appeals, protesting the district court's exclusion of the testimony of nurse Poret and Dr. Piland's testimony as to the standard of care, as well as the district court's decision not to credit the testimony of Drs. Cuenca and Rankin. Cleveland also contests the district court's ultimate finding that she failed to carry the burden of proof.

II

The United States is immune from suits "save as it consents to be sued." *United States v. Mitchell*, 445 U.S. 535, 538 (1980). The Federal Tort Claims Act constitutes a waiver of sovereign immunity. *See* 28 U.S.C. § 1346(b). "Under the Act, the United States is liable for the acts of its employees only under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Sanchez v. Rowe*, 870 F.2d 291, 295 (5th Cir. 1989) (internal quotation omitted). Here, the BJACH is a government entity and thus subject to the waiver of immunity under the FTCA. *See Hayes v. United States*, 44 F.3d 377, 378 (5th Cir. 1995) (noting that the FTCA's waiver of sovereign immunity is generally applicable to the BJACH). State substantive law applies in suits brought under the FTCA, *Simon v. United States*, 891 F.2d 1154, 1156 (5th Cir. 1990), and we apply the law of the state in which the suit arises, *Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986). *See also Hollis v.*

*United States*, 323 F.3d 330, 334 (5th Cir. 2003) ("Under the FTCA, liability for medical malpractice is controlled by state law. . . .").

Under Louisiana law, the plaintiff in a medical malpractice suit has the burden of proving, by a preponderance of the evidence:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injures that would not otherwise have been incurred.

La. R.S. 9:2794. It is "generally necessary" to use an expert witness to prove a medical malpractice claim. *Broussard v. Andersson*, 921 So.2d 128, 132 (La. Ct. App. 2005); *see also Lindner v. Hoffman*, 894 So.2d 427, 431 (La. Ct. App. 2005) (stating the general rule that in order to establish a claim of medical malpractice, the plaintiff "must demonstrate the degree of care ordinarily exercised by a physician in a particular medical specialty"). Importantly, "[w]here the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care." *Id.* In other words, to succeed in a medical malpractice claim against a medical specialist, the plaintiff must offer testimony of the applicable standard of care in the particular specialty of the allegedly negligent doctor and the proffered expert must specialize in that peculiar field.

We review the district court's decision to exclude expert testimony for an abuse of discretion. *United States v. Clements*, 73 F.3d 1330, 1334 (5th Cir. 1996). If we determine that the district court abused its discretion in excluding evidence, this court will not overturn the decision "unless the ruling affected [the] substantial rights of the complaining party." *United States v. Ragsdale*, 426 F.3d 765, 774-75 (5th Cir. 2005) (quoting *Bocenegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)).

A

Cleveland challenges the district court's decision to exclude Poret's testimony. Under Louisiana law, a nurse may not testify against a physician. La. R.S. 9:2794D.[4] Furthermore, the Louisiana courts have observed that emergency room physicians and non-physician employees are governed by different standards of care. *Wright v. HCA Health Serv. of Louisiana*, 877 So.2d 211, 215 (La. Ct. App. 2004) (differentiating between the standard of care applicable to emergency room

---

[4] The relevant statute states:
D. (1) In a medical malpractice action against a physician, licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37: 1261 et seq., for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from acceptable standards of medical care only if the person is a physician who meets all of the following criteria:
(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.
(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.
(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.
(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association's Liaison Committee on Medical Education or the American Osteopathic Association.
La. R.S. 9:2794(D).

physicians and the standard governing the nursing staff). Thus it is without question that under Louisiana law, Poret could not testify as to the standard of care governing an emergency room physician. *See Taplin v. Lupin*, 700 So.2d 1160, 1162 (La. Ct. App. 1997) (holding that a registered nurse is not qualified to testify as to whether a doctor, certified in internal medicine, breached the applicable standard of care). In this case, however, we must consider whether Louisiana law permits a nurse to testify against a *physician assistant*.

Both parties and their experts applied the standard of care of a physician to Eubanks' alleged acts of medical negligence. This is consistent with Louisiana law, which indicates that physician assistants may perform most of the same tasks as physicians, frequently without direct supervision.[5] Indeed, the Louisiana legislature specifically noted that one of the goals of establishing a physician assistant program in the state was to enable physicians to "delegate certain health care tasks" to physician assistants. La. R.S. 37:1360.21C.

Poret's written report focused exclusively on the failure of the physician assistant at BJACH to meet the requisite standard of care. In her opposition to the United States' motion to exclude Poret's testimony, Cleveland attempted to argue that Poret was qualified to read and explicate the "chronology of care" Samuel received at BJACH, as Poret possesses a Bachelors Degree in Nursing and is a Certified Legal Nurse Consultant. However, this argument is inapposite given the content

---

[5] A physician assistant is "qualified to take patient histories, perform physical examinations, and order and interpret certain diagnostic tests. A physician assistant may implement treatment plans as delegated by the supervising physician and explain them to patients." La. R.S. 37:1360.21(B). A physician assistant, while acting under the supervision of a physician, may act without the "physical presence" of the supervising physician and may act without consultation with a supervising physician when performing acts with prior delegated authority or when the act is undertaken pursuant to clinical guidelines or protocols. La. R.S. 37:1360.22. *See also Baker v. Williams*, 825 So.2d 563, 570 (La. Ct. App. 2002).

of her report. As a nurse, Poret is not qualified to testify as to a physician's standard of care or the standard of care governing a physician assistant who stands in the place of the treating physician. *See Broussard*, 921 So.2d at 132 (stating the rule that only physicians qualified in a particular medical field may testify as to the standard of care owed by physicians in that specialty). The district court did not abuse its discretion in excluding Poret's testimony as she was not qualified to testify as to the standard of care applicable to a physician assistant.

B

Cleveland also argues that the district court abused its discretion in excluding portions of Dr. Piland's testimony. The district court ruled that Dr. Piland's testimony went beyond the scope of a treating physician, by offering his opinion on the standard of care owed by emergency room physicians. The district court noted that Dr. Piland was qualified as an expert in internal medicine but had not worked in an emergency room other than during a brief time during his residency. Thus, applying the standards articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), the district court concluded that the acceptable standard of care for an emergency room was not within the scope of his expertise as an internist.

Emergency room medicine is considered its own medical specialty. *Iseah v. E.A. Conway Mem'l Hosp.*, 591 So.2d 767, 772 (La. Ct. App. 1991). A medical specialist is held to the standard of care "ordinarily exercised and possessed by physicians within his medical specialty." *Ardoin v. Hartford Accident & Indem. Co.*, 360 So.2d 1331, 1340 (La. 1978). Thus, "emergency room physicians are held to the standard of care of specialists in emergency care." *Wright v. HCA Health Serv. of La.*, 877 So.2d 211, 215 (La. Ct. App. 2004). When the claim of malpractice turns on the negligence of a specialist, "only those qualified in that specialty may offer expert testimony and

evidence of the applicable standard of care." *Primeaux v. St. Paul Fire & Marine Ins. Co.*, 862 So.2d 496, 503 (La. Ct. App. 2003).

Although acknowledging this general rule, Cleveland argues on appeal that the district court abused its discretion in excluding Dr. Piland's testimony because the diagnosis of congestive heart failure is not unique to the emergency room setting and because as an internist, Dr. Piland was qualified to testify as to the appropriate standard of care for diagnosing that disease. Cleveland supports this argument through reference to *McDaniel v. Reed*, 798 So.2d 1121 (La. Ct. App. 2001), where the court held "it is the specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised." *Id.* at 1123.

However, Dr. Piland never stated that the standard of care for diagnosing congestive heart failure in the emergency room setting is identical to its diagnosis in the field of internal medicine. *See Richardson v. State*, 726 So.2d 417, 421 (La. Ct. App. 1998) (discussing that an expert witness must establish that there is an identical standard of care for a medical procedure that is performed regularly in different medical disciplines if he wishes to testify as to practices outside of his own speciality). Louisiana courts have recognized that the emergency room setting is different in kind from other medical disciplines. *See Dalgo v. Landry*, 424 So.2d 1159, 1161 (La. Ct. App. 1982) (affirming the district court's conclusion that "emergency room physicians are in a different forum than a specialist"); *see also Campbell v. Hosp. Serv. Dist. No. 1 Caldwell Parish*, 862 So.2d 338, 350-51 (La. Ct. App. 2003) (discussing extensively the distinction between the standards of care applicable when treating the same disease in the emergency room setting versus other specialities); *Armand v. State, Dept. of Health and Human Resources*, 729 So.2d 1085, 1095 (La. Ct. App. 1999)

(Fitzsimmons, J., dissenting) (noting the time-sensitive nature of admissions and the different nature of the diagnostic work in an emergency room). In the absence of some testimony establishing that the standard of care for diagnosing congestive heart failure is the same in the fields of both internal medicine and emergency medicine, Cleveland cannot rely on Dr. Piland's testimony as to the applicable standard of care. Therefore, the district court did not abuse its discretion in excluding testimony by Dr. Piland as to the standard of care for diagnosing congestive heart failure in the emergency room setting.[6]

C

Cleveland next argues that the district court erred in disregarding the testimonies of Drs. Rankin and Cuenca as to the relevant standard of care. In its memorandum opinion, the district court stated that neither Dr. Rankin nor Dr. Cuenca was an expert in emergency medicine and furthermore that neither had established the relevant standard of care. In a footnote, the district court went on to state, "[e]ven if the plaintiff's physicians' testimony were accepted, it is greatly outweighed by the testimony of Dr. John McMillan, a physician who has practiced emergency room medicine full-time

_____

[6] Appellant briefly argues that the trial court erred when it ruled that *res ipsa loquitur* did not apply. Appellant observes that "expert testimony is not required where the physician does an obviously careless act, such as the failure to attend a patient when the circumstances demonstrate the serious consequences of the failure." *Aultman v. Ins. Corp. of Am.*, 716 So.2d 182, 186 (La. Ct. App. 1998). In order to take advantage of the doctrine, the plaintiff must demonstrate that "the injury [is] of the type which does not ordinarily occur in the absence of negligence. In other words, the event must be such that in light of ordinary experience it gives rise to an inference that someone must have been negligent." *Henderson v. Homer Mem'l Hosp.*, 920 So.2d 988, 996 (La. Ct. App. 2006); *see also Gisclair v. Bonneval*, 928 So.2d 39, 43 (La. Ct. App. 2005) (noting that examples of situations in which *res ipsa loquitur* would apply include "fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body"). In those situations, a lay person may infer negligence. *Gisclair*, 928 So.2d at 43. We cannot say that this is a "situation involving [an] accident[ ] that normally do[es] not occur, absent negligence." *Honeycutt v. State Farm Fire & Casualty Co.*, 890 So.2d 756, 759-60 (La. App. Ct. 2004). The district court did not err in declining to apply this doctrine.

for 18 years." The district court's ruling in favor of the United States was based on its finding that Cleveland had failed to offer testimony as to the relevant standard of care, as required by Louisiana law. This ruling was premised on the court's decision to disregard the doctors' testimony as to the standard of care. The district court also concluded, however, that even if it accepted that Cleveland *had* offered evidence of the standard of care through the testimonies of these doctors, that the expert testimony provided by the United States outweighed that of Cleveland.

As a reviewing court, we owe great deference to the findings of the trial court with respect to expert testimony. *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004). Insofar as the district court chose to exclude the testimony of the doctors, we review for an abuse of discretion. *United States v. Dixon*, 413 F.3d 520, 523 (5th Cir. 2005). We also review for an abuse of discretion the district court's decision to credit one expert over another. *See Pittman v. Gilmore*, 566 F.2d 1259, 1261 (5th Cir. 1977) (stating that "the trier of fact is the final arbiter as between experts whose opinions may differ" and finding no abuse of discretion in the district court's ultimate decision).

Cleveland summarily asserts that Dr. Rankin, as a radiologist, was qualified to testify that in his experience, patients with a history of congestive heart failure typically are given x-rays and that it was a deviation from the standard of care for Eubanks not to order chest film. However, as discussed above, an expert in one medical speciality must demonstrate that the standard of care is identical to that in another area before he may testify as an expert in the other area. *See Richardson*, 726 So.2d at 421. Not only did Dr. Rankin not assert that the standard was the same, but specifically stated during his deposition, "I would also feel that I would not be qualified to make an opinion about when a medicine type doctor should nor should not order x-rays on someone given the symptomatology of what they are having." Therefore, the district court did not abuse its discretion

-14-

in disregarding the testimony by Dr. Rankin as to the applicable standard of care.

Cleveland also argues that Dr. Cuenca was qualified to offer testimony as to the requisite standard of care because he practiced internal medicine and had emergency room experience. Dr. Cuenca asserted that as an internist he dealt with patients with congestive heart failure on a "daily" basis and was very familiar with the risk factors for complications from congestive heart failure, as well as methods of diagnosis and treatment. Dr. Cuenca asserted that Eubanks did not take into account Samuel's risk factors, including morbid obesity, chronic hypoxemia (low circulating blood oxygen), a prior history of congestive heart failure, diabetes, hypertension, subendocardial infarctions (heart attacks), signs of coronary artery disease, renal failure, and gouty arthritis. Although Eubanks was aware of the morbid obesity and the diabetes, his failure to review the medical records prior to Samuel's discharge from the emergency room meant that he did not take these other risk factors into account. Dr. Cuenca concludes that in light of these risk factors, Eubanks should have performed a number of tests on Samuel, including a chest x-ray and tests to determine his blood oxygen level. Dr. Cuenca opined that had these tests been performed, Eubanks would have diagnosed congestive heart failure at that time and aggressively treated that disease rather than simply treating Samuel for an upper respiratory infection.

Dr. McMillan was proffered by the United States as an expert in emergency medicine. He directly contradicted Dr. Cuenca's testimony and concluded that Eubanks had not deviated from the standard of care. Dr. McMillan's report specifically addressed Dr. Cuenca's assertion that Samuel should have had more extensive tests during his initial visit to the ER and that Eubanks' failure to give those further tests was a deviation from the standard of care. Dr. McMillan correctly observed in his initial report that Dr. Cuenca himself admitted that if an individual presented with only morbid obesity

-15-

as a risk factor (as did Samuel), then a chest x-ray and other tests would not be medically indicated. Dr. Cuenca's opinion that further tests should have been administered rested on his awareness of Samuel's other risk factors, such as his history of congestive heart failure, renal insufficiency, and other cardiac problems, which were evident in his medical record. However, Dr. McMillan asserted that it was not typical for an emergency room physician to have access to a patient's medical history. Dr. McMillan explained that while the records might be called for, they are frequently unavailable, particularly at night, or might take a while to arrive in the emergency room during the day. Physicians therefore will see the patients prior to their review of the records and rely on the patient's description of his medical history and current medications. Dr. Cuenca did not offer an opinion—and as an internist was not qualified to do so—as to typical emergency room procedures regarding medical records.

We need not decide whether it was an abuse of discretion for the district court to disregard Dr. Cuenca's testimony as to the diagnosis and treatment of an individual with congestive heart failure as it was within the court's discretion to choose to give greater weight to the testimony of Dr. McMillan, the expert witness for the United States. *See Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 894 (5th Cir. 1991) (stating that the district court is "not obligated to accept or even credit the testimony of [the plaintiff's] experts"). Dr. Cuenca's theory of Eubanks' deviation from the standard of care turned on Eubanks' disregard for Samuel's extensive risk factors which were contained only in his medical records. However, Dr. Cuenca was not proffered as an expert in emergency medicine and thus, could not—and indeed did not—speak to typical procedures in emergency rooms regarding the examination of a patient's medical history. It was thus not an abuse of discretion for the district court to accept the opinion of the United States' expert witness. *See Pittman v. Gilmore*, 556 F.2d

-16-

1259, 1261 (5th Cir. 1977) ("It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it.").

III

Finally, Appellant argues that the district court erred in concluding that she did not establish her case by a preponderance of the evidence because the United States own witness testified that the defendant's conduct fell below the requisite standard of care. Appellant characterizes Dr. McMillan's testimony as including his opinion that BJACH's treatment of Samuel fell below the applicable standard of care because Eubanks prescribed a drug without a physician approval and did not consult with a physician prior to determining a course of treatment for Samuel.

We review the district court's factual determinations in a FTCA case under the clearly erroneous standard. *See* Fed. R. Civ. P. 52(a); *Dickerson ex rel. Dickerson v. United States*, 280 F.3d 470, 474 (5th Cir. 2002). "A trial court's findings are clearly erroneous when, after reviewing the entire evidence, the Court is left with the definite and firm conviction that a mistake has been committed." *Id.* "This standard applies to a district court's determination that a plaintiff has failed to carry its burden of proof." *Bartmess v. Federal Crop Ins. Corp.*, 845 F.2d 1258, 1261 (5th Cir. 1988).

Dr. McMillan testified that whether or not a physician assistant could prescribe drugs without a supervising physician's authorization varied from emergency to emergency room and turned on whether there was general authorization to prescribe. Contrary to Cleveland's assertion, however, Louisiana law *does* permit a physician's assistant to prescribe certain drugs and medicines. *See* La.

-17-

R.S. 37:1360.31B(8) (authorizing a physician assistant to "prescrib[e] certain drugs and medical devices to the extent delegated by the supervising physician. . . ."). Although Eubanks' authorization by BJACH was not part of the original trial record,[7] on appeal the United States has provided this court with the documents indicating that Eubanks was authorized to prescribe the class of autonomic drugs known as sympathomimetic (adrenergic) agents, which included *Proventil*. He was also authorized to prescribe expectorants and decongestents (*Entex*) and antibiotics (*Zithromax*). Furthermore, Louisiana law permits a physician assistant to act independently of a supervising physician when the authority to act had been previously delegated. *See* La. R.S. 37:1360.22. The authorizations provided to this court on appeal indicate that Eubanks was authorized to "diagnose and treat minor illnesses" without a physician being present.

Dr. McMillan's testimony thus does not indicate that Eubanks violated the standard of care, as he is authorized by statute and by hospital policy to act without the presence of a physician and to prescribe certain drugs. Thus we cannot conclude that the district court clearly erred in determining that Cleveland failed to carry her burden of proof.

For the foregoing reasons we AFFIRM the judgment of the district court.

---

[7]  This court granted the unopposed motion to supplement the record.

-18-