772 So.2d 698 (2000)
Dianna ABDULLAH and Muhammed Abdullah
v.
Scott SIMMONS, M.D., et al.
No. 98-CA-0564.
Court of Appeal of Louisiana, Fourth Circuit.
September 13, 2000.
Rehearing Denied November 15, 2000.
*699 Stewart E. Niles, Jr., Amy M. Winters, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, Louisiana, Counsel for Defendant/Appellant.
Leonard A. Radlauer, Radlauer & Bernstein, New Orleans, Louisiana, Counsel for Plaintiffs/Appellants.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, and Judge MICHAEL E. KIRBY.
MURRAY, J.
Defendant J. Ollie Edmunds, M.D., appeals a judgment rendered upon a jury verdict finding him 75% liable for injuries *700 sustained by plaintiff Diana Abdullah in connection with hip replacement surgery. Plaintiffs, Dianna and Muhammed Abdullah, appeal claiming that the jury erred in assigning 25% of the fault to Ms. Abdullah, and in finding that Mr. Abdullah was not entitled to damages for loss of consortium. For the following reasons, we affirm.

FACTS:
On October 18, 1993, Dianna Abdullah, twenty-eight years old, underwent surgery for a total hip replacement. Ms. Abdullah's medical history included falling on porch steps when she was four years old and dislocating her hip. After the dislocation was corrected, she walked with a slight limp. In April of 1992, Ms. Abdullah fell in a ditch while carrying one of her twins, and broke her hip. For over a year, she attempted to live with the pain, but in the summer of 1993 decided that she could no longer go on without some corrective measures. After consulting several physicians, she chose Dr. Edmunds to perform the surgery.
Dr. Edmunds explained to Ms. Abdullah that she could choose to do nothing and continue with the excruciating pain, she could have a hip fusion whereby her hip joint would be frozen for the remainder of her life, or she could have a total hip arthroplasty, a procedure utilizing a hip prosthesis with screw fixation. According to Dr. Edmunds' clinic notes of July 7, 1993, Ms. Abdullah understood that there were potential complications with the total hip arthroplasty, including loosening, hip revision, infection, pulmonary embolus, and thrombophlebitis. Although the clinic notes do not reflect any discussion about potential bleeding complications, Dr. Edmunds testified that he also explained to Ms. Abdullah that she had a greater risk of bleeding during this surgery because of her medical history. Ms. Abdullah agreed to the total hip arthroplasty.
Prior to surgery, Ms. Abdullah signed an informed consent form indicating that she understood the alternatives available to her, and that the possible risks of the elected surgery were death, brain damage, quadriplegia, paraplegia, loss of an organ, loss of an arm or leg, or disfiguring scars. She understood that blood replacement might be required, and in anticipation of that event, Ms. Abdullah stored several pints of her own blood.
Dr. Edmunds employed the "quadrant" system, developed to help surgeons determine in which area holes should be drilled to affix the acetabulum cup to the pelvic wall. This method divides the acetabulum cup into four regions or quadrants: the posterior superior and posterior inferior, two relatively safe areas, and the anterior superior and anterior inferior, areas designated as dangerous because of the potential of damaging organs and blood vessels on the other side. According to Dr. Edmunds' operative notes, the prosthetic acetabulum cup did not fit well when he initially positioned it. He decided, therefore, that Ms. Abdullah would best benefit by placing acetabular screws within the cup. His notes further indicate that "[w]hile drilling the posterior, superior hole for the screw fixation the drill bit was removed and non-pulsatile bleeding was revealed through that screw hole, apparently originating from within the pelvis." Dr. Edmunds was able to control the bleeding, but only after Ms. Abdullah had lost a considerable amount of blood. Blood replacement was begun, and Dr. Edmunds continued the surgery. Near completion, he was informed that Ms. Abdullah was not responding to the blood replacement. Dr. Edmunds completed the surgery, closed the wound, and called for a vascular surgeon to evaluate Ms. Abdullah.
Dr. Donald Akers, a vascular surgeon, performed a laparotomy and found significant amounts of blood in the pelvic region. Both the external iliac vein and artery were found to be completed transected near their origin. Dr. Akers grafted the injured blood vessels, and inserted a Greenfield filter, a device used to block potential blood clots from traveling to the lungs. After completing the emergency *701 surgery, Dr. Akers found good pulses in Ms. Abdullah's right lower extremities. Ms. Abdullah received thirty-six units of blood during the two surgeries.
Following surgery, Ms. Abdullah continued to see Dr. Edmunds for follow-up visits, and reported to him that she was much improved. She was virtually pain-free and was able to walk using only a cane for balance.

DISCUSSION:

A. Dr. Edmunds' appeal:
Dr. Edmunds appeals the trial court judgment claiming that because Ms. Abdullah did not establish the correct standard of care through credible expert testimony, the jury's finding of negligence is erroneous because the finding is based on an incorrect standard of care.
An appellate court reviewing a judgment after a trial on the merits must determine if the trial court's findings are reasonable in light of the record reviewed in its entirety. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). Because a court of appeal has a constitutional function to perform, it has the duty to determine whether the trial court's judgment was clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216, 221.
Generally, in a medical malpractice case, the plaintiff must prove that:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794 A. Thus, a plaintiff must establish the standard of care applicable to the charged physician, a violation by that physician of the standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. To determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of the medical profession and who are qualified to testify. Jackson v. State through Charity Hosp. of Louisiana at New Orleans, 94-2090 (La.App. 4 Cir. 5/16/95), 655 So.2d 795.
However, there are circumstances when a plaintiff can prevail in a medical malpractice action even though she has not introduced evidence of the correct standard of care. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228, 1230. If a defendant/physician or defense expert testifies as to the correct standard of care, and the record contains objective evidence from which a jury may infer negligence from the facts, the plaintiff can prevail. Id.
The crux of appellant's argument is that Dr. Christopher Cenac, plaintiffs' expert witness, relied on an outdated standard of care in opining that Dr. Edmunds committed malpractice. Accepting this position as correct, the record nevertheless contains sufficient factual bases for the jury's verdict.
*702 The record is clear that Dr. Edmunds was aware of Ms. Abdullah's medical history, including the surgery at age four to correct a hip dislocation, four pregnancies, and the fall in 1992 that resulted in a broken hip. Indeed, Dr. Edmunds concedes that these events could have caused her iliac vein and artery to be in an abnormal position. However, it is Dr. Edmunds' position that because he drilled in a "safe zone," he should not be found negligent for "nicking" Ms. Abdullah's iliac vein and artery.
Dr. Richard L. Meyer, one of the members of the medical review panel, was called as a defense expert. He testified that, within a reasonable medical probability, Ms. Abdullah's iliopsoas muscle, which lies between the pelvic wall and the iliac vein and artery, was extremely thin due to her prior hip surgery and four pregnancies. Consequently, it was his opinion that, to a medical probability, her iliac vein and artery were closer to the backside (posterior) of her pelvis.
Dr. James Monroe Laborde, also a member of the medical review panel called as a defense expert, confirmed that Ms. Abdullah's iliac vein and artery could have shifted, and that her iliopsoas muscle was as much as fifty percent thinner than normal. Based on this fact, he was asked why, given Ms. Abdullah's history, additional testing such as a CT scan was not employed to determine the exact location of her blood vessels. Dr. Laborde replied that "[t]he reason I wouldn't have is that my intention would have been to stay posteriorly, and ifto avoid those vessels. So those vessels could be avoided by staying posteriorly, so that it would not be necessary to know exactly where they are." Dr. Laborde then testified that there is no violation of the standard of care if a doctor intends to drill in a safe zone, but, inadvertently, drills in a danger zone.
In this case Dr. Edmunds and Dr. Simmons, the assisting surgeon, both testified that Dr. Edmunds drilled in a safe zone. Nonetheless, the record is replete with evidence that Ms. Abdullah's anatomy was not that of a normal adult, and that Dr. Edmunds was fully aware of the potential abnormalities. The record is, however, void of any evidence that Dr. Edmunds attempted to determine prior to drilling exactly where Ms. Abdullah's iliac vein and artery were located.
Louisiana Revised Statute 9:2794(A)(2) provides that in a malpractice action based on the negligence of a licensed physician, the plaintiff shall have the burden of proving:
That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(emphasis supplied) Applying this principle to the facts presented, the jury was not manifestly erroneous in finding that Ms. Abdullah carried her burden of proof. Even assuming that employing the quadrant system when drilling holes to affix the prosthetic cup was within the standard of care, and that the posterior superior and posterior anterior zones were safe quadrants within which to drill, the jury could infer from the evidence presented that Dr. Edmunds was negligent in drilling in the posterior superior quadrant without attempting to positively locate the iliac vein and artery, given Ms. Abdullah's medical history.
The jury answered affirmatively the interrogatory: Did plaintiff prove by a preponderance of the evidence that Dr. Edmunds failed to use reasonable care and diligence, along with his best judgment, in the medical care and treatment he rendered to Dianna Abdullah? Thus the jury apparently accepted the defense experts' opinion that Ms. Abdullah's iliac vein and artery were in an abnormal position, but rejected Dr. Laborde's testimony that Dr. Edmunds' intention to avoid those vessels by staying in a "safe zone," was sufficient to relieve him of the responsibility for the *703 consequences of his not determining exactly where those vessels were.
A physician may not avoid a finding of negligence merely by claiming to have followed the accepted procedure. He also must evaluate each patient on a case-by-case basis, and use his best judgment in the application of that procedure. The record evidence supports the jury's finding that Dr. Edmunds did not use his best judgment in the application of his skill in following the usual procedure in his treatment of Ms. Abdullah in light of her medical history. The jury's determination that he was negligent in his treatment of Ms. Abdullah should not, therefore, be disturbed.

B. Dianna and Muhammed Abdullah's appeal:
The first assignment of error raised by plaintiffs is that the jury was manifestly erroneous because it found Ms. Abdullah 25% at fault for her injuries. They claim that because Ms. Abdullah was asleep during the entire operation, she could not possibly have contributed to her injuries. However, Ms. Abdullah also alleged that she was forced to have an abortion for one pregnancy and miscarried a second pregnancy because of the use of Coumadin, an anticoagulant, after her surgery.
Ms. Abdullah testified that because she was taking Coumadin, two pregnancies were terminated, one by abortion and the other by miscarriage. Ms. Abdullah explained that she understood that the Coumadin could cause birth defects, so when she became pregnant for the first time after the operation, she chose to have an abortion. She opined that the miscarriage was caused because of having Coumadin in her system for a long period of time.
Dr. Akers testified that when he placed Ms. Abdullah on Coumadin therapy he thoroughly explained to her that she should not become pregnant while on the drug. However, if she desired to become pregnant during her Coumadin therapy, he would recommend that she discontinue the Coumadin and receive Heparin injections before becoming pregnant and during the first trimester. Dr. Akers explained that although Heparin is also a blood-thinning medication, it does not have the same side effects as Coumadin. Despite this advice, however, Ms. Abdullah twice became pregnant while on Coumadin therapy. There is nothing in the record to indicate that a doctor advised her to have an abortion for the first pregnancy; there is only Ms. Abdullah's testimony that she chose to have one because she feared her child would have birth defects. As to the second pregnancy, Dr. Alfred Robicheaux, an obstetrician with a specialty in maternal fetal medicine, testified that he monitored Ms. Abdullah's second pregnancy, and had some concerns because of her reported history of Coumadin therapy. However, he testified that the miscarriage suffered by Ms. Abdullah was not related to the use of Coumadin, but was in fact an anembryonic pregnancy, more commonly referred to as a "false pregnancy."
Thus, it can be inferred from the record that the jury found Ms. Abdullah contributorily negligent by becoming pregnant on two occasions despite the advice of her physician. The allocation of comparative fault is a factual determination left to the discretion of the trial court. A jury's factual determination will not be disturbed absent manifest error. Scamardo v. New Orleans Stevedoring Co., 595 So.2d 1242 (La.App. 4 Cir.1992). We find no error in the jury's findings.
In their second assignment of error, plaintiffs claim that the jury erred in not awarding Mr. Abdullah damages for loss of consortium. Mr. Abdullah testified that he suffered mental anguish during his wife's surgery and subsequent intensive care. He has had to adjust to seeing the scar she incurred as a result of the surgery, and to her alleged difficulties with *704 the Coumadin therapy, including the loss of their child by abortion.
A loss of consortium claim includes elements of loss of service, loss of love and affection, loss of society and companionship, loss of sexual relations, loss of support, and loss of felicity. Doe v. Roman Catholic Church for Archdiocese of New Orleans, 615 So.2d 410, 417 (La.App. 4 Cir.), writs denied, 618 So.2d 412 and 413 (La.1993). None of the items claimed as damages by the Abdullahs qualifies as proper elements of a loss of consortium claim. We find no abuse of discretion in the jury's failure to award loss of consortium damages to Mr. Abdullah.
Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
KIRBY, J., dissents with reasons.
ARMSTRONG, J., dissents for the reasons assigned by Judge KIRBY.
KIRBY, J., dissenting with reasons.
I respectfully dissent. The fact that Ms. Abdullah suffered injuries is not sufficient evidence to prove negligence of Dr. Edmunds. La.Rev. Statute 9:2794. The two principal reasons for which I dissent follow.
First, Dr. Edmunds had no medical records to review and no knowledge of the anatomical variant, i.e. the iliopsoas muscle was nothing more than a thin film.
I didn't know what kind of surgery exactly had been done, but I knew that she had hadshe had had an open reduction, an internal fixation or open reduction of the dislocated hip.
I did not know at that time that she had had the iliopsoas muscle released. I didn't find that out until I got in there andand looked at the resitropian and found no iliopsoas muscle on there.
(Dr. Edmund's testimony, Record p. 201.)
Dr. Edmunds stated whenever there is a congenital problem, along with a prior surgery, abnormalities are a factor, one which he took into account. Nevertheless, there was no other way for Dr. Edmunds to have confirmed that the iliopsoas muscle had been released. Thus, he had no way of knowing beforehand that it had been reduced to a thin film.
Second, Dr. Rubash, the creator of the Quadrant System, reviewed the medical records in this case and found that Dr. Edmunds had drilled in the posterior superior quadrant. This was the proper place to drill according to the Quadrant System, one of the most modern and widely accepted ways for placement of screws in hip replacement procedure.
Because Dr. Edmunds drilled in a location in accordance with this widely accepted method, he cannot be held to have breached the standard of care. But for Ms. Abdullah's anatomical variant, she would not have sustained injury.