921 So.2d 128 (2005)
Marsha BROUSSARD, Wife of/and David Broussard, Individually, and on Behalf of their Minor Daughter, Grace Broussard
v.
Dr. Hans C. ANDERSSON, Dr. Michael R. Melancon, and Dr. Duane W. Superneau.
No. 2005-CA-0006.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 2005.
*129 Lawrence D. Wiedemann, Wiedemann & Wiedemann, New Orleans, LA, for Plaintiff/Appellant.
Daniel C. Palmintier, Charles J. Boudreaux, Jr., Onebane Law Firm, Lafayette, LA, for Defendant/Appellee.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge MAX N. TOBIAS, JR., Judge DAVID S. GORBATY).
DAVID S. GORBATY, Judge.
Plaintiffs Marsha Broussard, wife of/ and David Broussard, individually, and on behalf of their minor daughter, Grace Broussard, appeal a summary judgment granted by the trial court in favor of Dr. Michael R. Melancon. For the following reasons, we affirm.

PROCEDURAL HISTORY:
After a medical review panel found that appellee Dr. Melancon and Dr. Duane W. Superneau did not breach the applicable standard of care, but that Dr. Hans C. Andersson was negligent in his treatment of Grace, the Broussard's filed suit on January 31, 2003 against all three doctors. Dr. Superneau moved for summary judgment in May 2004, which was granted by *130 the trial court dismissing all claims against him. The record does not indicate that an appeal of that ruling was taken. On July 28, 2004, Dr. Melancon moved for summary judgment, which was also granted by the trial court. This appeal followed.

FACTS:
Grace Broussard was born May 5, 1997, the fourth child of Marsha and David Broussard. She was of normal weight and height at birth. From birth until approximately 8 months old, Dr. LeBron-Berges, a general pediatrician, treated Grace. During this period, Grace suffered from numerous upper respiratory infections, necessitating a referral to an allergist. Additionally, at her 6-month visit, it was noted in Dr. LeBron-Berges' records that he was referring Grace for a chromosomal study; the results of the study were normal.
The records reveal that Grace first saw Dr. Melancon, a general pediatrician, on January 14, 1998. According to Dr. Melancon's records, Dr. Prather, the allergist who conducted a study on Grace at the request of Dr. LeBron-Berges, referred Grace to Dr. Melancon. Dr. Melancon noted at the first visit that Grace's mother was concerned about her growth. In February of 1998, Dr. Melancon noted a mass on the left side of Grace's neck, and referred her to Dr. Falterman, a pediatric surgeon at Ochsner in New Orleans, who also made periodic calls in the Lafayette area.[1] A letter addressed to Dr. Melancon from Jennifer Roggenbuck, a genetic counselor, and Dr. Duane Superneau, dated February 17, 1998, indicates that they had evaluated Grace on February 12, 1998, at the request of Dr. Falterman. The assessment, based on a family history and physical examination, indicated that Grace had some type of skeletal dysplasia. The exact type was unknown; therefore, further growth and development follow-up was needed to make a specific diagnosis and prognosis. The letter indicates that a skeletal survey was ordered to document any bony changes and to provide a baseline for future studies, and that genetic counseling was initiated with the Broussards.
Records from Ochsner Clinic indicate that a skeletal survey, ordered by Dr. Superneau, was performed on Grace on February 12, 1998. The results of the survey were dictated on February 25 and reviewed on March 2. The x-ray of the chest indicated an enlarged cardiac silhouette. There is nothing contained in the records to indicate that the results were reported to anyone other than Dr. Superneau.[2]
Grace continued to see Dr. Melancon for general pediatric treatment. The records indicate that Grace was treated in the emergency room for an upper respiratory infection and otitis media in February 1998. In May of 1998, Grace was hospitalized with a urinary tract infection. In June, Grace was again treated in the emergency room for viral syndrome; it was noted at this time that she was anemic. In the fall of 1998, Grace began suffering from chronic diarrhea. Dr. Melancon ordered a giardia antigen[3] to test for giardiasis, but the results were negative. *131 In October, Grace was again seen in the emergency room because of high fever. The doctor diagnosed viral syndrome and pharyngitis. In late October, Dr. Melancon referred Grace to an ear, nose and throat specialist because of her recurring ear infections. Dr. Montgomery recommended that tubes be inserted; the records indicate that this was done in early November.
Dr. Melancon's records reveal that he was copied on a letter dictated on October 12, 1998 by Dr. Hans Andersson, and co-authored by Kelly Jackson, a genetics counselor at Tulane University Medical Center. The letter indicates that Grace was seen in Lafayette on that date for an initial evaluation of a genetic/inherited cause of her poor growth and possible skeletal dysplasia. Dr. Andersson confirmed the previous preliminary diagnosis of Dr. Superneau, i.e., possible skeletal dysplasia. Dr. Andersson reported that he would request the previous skeletal surveys and reports from Ochsner, and would probably order more x-rays.
According to the petition, Dr. Andersson ordered another skeletal survey of Grace that was performed on April 6, 1999. This survey, in addition to suggesting musculoskeletal abnormalities, indicated that Grace had possible cardiomyopathy.[4] A notation at the bottom of the report indicates that Dr. Melancon was copied; however, Dr. Melancon last treated Grace on March 18, 1999.

DISCUSSION:
A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. Proc. art. 966. The burden remains with the movant. However, if the movant will not bear the burden of proof at trial, the movant's burden does not require him to negate all essential elements of the adverse party's claim, but rather to point out that there is an absence of factual support for one or more elements essential to the adverse party's claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La.Code Civ. Proc. art. 966 C(2).
Dr. Melancon moved for summary judgment arguing that plaintiffs could not prove that he had breached the standard of care applicable to a physician in his specialty (general pediatrics). Dr. Melancon produced in support of his motion the unanimous opinion of the medical review panel finding that he had not breached the applicable standard of care, an affidavit from each of the panel members, and Grace Broussard's medical records. Because plaintiffs failed to produce any competent medical expert evidence to establish the standard of care applicable to Dr. Melancon, or that he had breached that standard, Dr. Melancon argued he was entitled to judgment as a matter of law.
Generally, in a medical malpractice case, the plaintiff must prove that:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practice in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the *132 plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.Rev.Stat. 9:2794 A.
Thus, a plaintiff must establish the standard of care applicable to the charged physician, a violation by that physician of the standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992, p. 2 (La.10/17/94), 643 So.2d 1228, 1230; Williams v. Memorial Medical Center, 03-1806, pp. 15, 16 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1054; Abdullah v. Simmons, 98-0564, p. 4 (La.App. 4 Cir. 9/13/00), 772 So.2d 698, 701.
To determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of the medical profession and who are qualified to testify. Jackson v. State Through Charity Hosp. of Louisiana at New Orleans, 94-2090, p. 3 (La.App. 4 Cir. 5/16/95), 655 So.2d 795, 797. The jurisprudence has recognized that "an expert witness is generally necessary as a matter of law to prove a medical malpractice claim." Williams v. Metro Home Health Care Agency, Inc., 02-0534, p. 5 (La.App. 4 Cir. 5/8/02), 817 So.2d 1224, 1228. Where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care. La.Rev.Stat. 9:2794 A(1); McDaniel v. Reed, 00-2529, p. 3 (La.App. 4 Cir. 10/3/01), 798 So.2d 1121, 1123.
In this case, plaintiffs are alleging that Dr. Melancon misdiagnosed Grace's condition after being notified via copies of skeletal x-rays ordered by Dr. Superneau. These x-rays, and subsequent x-rays ordered by Dr. Andersson, revealed the presence of an enlarged heart, which was not reported to Grace's parents. The subsequent lack of appropriate treatment resulted in irreparable heart and brain damage. Plaintiffs argue that expert testimony is not necessary because it is obvious negligence for any doctor to ignore x-ray evidence of an enlarged heart in a patient.[5]
Dr. Melancon has sufficiently proven that plaintiffs will be unable to carry their burden of proof at trial because of a lack of factual support for their claims. Dr. Melancon submitted the medical review panel findings, the affidavits of each doctor on the panel and Grace's medical records to support his position that his treatment of Grace did not fall below the standard of care applicable to him. See, Williams v. Memorial Medical Center, 03-1806, p. 19 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1056, writ denied 04-0963 (La.6/4/04), 876 So.2d 93.
*133 We agree with Dr. Melancon that it is incumbent upon plaintiffs to establish the standard of care expected of him as a general pediatrician in this case. Dr. Melancon initially referred the Broussards to specialists because of concerns with a growth on the side of Grace's neck. He clearly recognized that this condition was outside the realm of his specialty. For plaintiffs to prove that he somehow breached the standard of care applicable to his specialty, expert testimony is necessary to establish the standard. Plaintiffs have failed to demonstrate that any actions by Dr. Melancon were so obviously negligent so as to preclude the necessity of expert testimony. Plaintiffs may not rest upon the allegations of their petition.
Accordingly, we affirm the judgment of the trial court.
AFFIRMED.
ARMSTRONG, C.J., concurs.
ARMSTRONG, C.J., concurs.
I respectfully concur in the majority's decision to affirm the judgment of the trial court.
NOTES
[1] The records reflect that Mrs. Broussard called Dr. Melancon's office to inquire if they could see Dr. Falterman in New Orleans to expedite matters.
[2] It is not clear from the record if the Broussards continued the genetic counseling at Ochsner, or if Dr. Falterman removed the cystic lesion from Grace's neck.
[3] Giardiasis is a diarrheal illness caused by a one-celled, microscopic parasite. Once infected, the parasite lives in the intestine of the host person or animal, and is passed in the stool.
[4] Cardiomyopathy is a condition in which the heart muscle becomes inflamed. There may be multiple causes for the inflammation including viral infections.
[5] Dr. Melancon argues that the record contains no evidence that he was aware of the first skeletal survey ordered by Dr. Superneau. Although he was copied with Dr. Superneau's report, the record is clear that the results of the first survey were not known until sometime after Dr. Superneau's report was dictated and transmitted. This Court, being a court of record, cannot assume that Dr. Melancon also received a copy of the survey. Further, whether or not Dr. Melancon received the survey is not germane to the issue of whether summary judgment was appropriate.