958 So.2d 87 (2007)
Jessie Mae BROWN
v.
TULANE MEDICAL CENTER HOSPITAL AND CLINIC, Dr. Raoul Rodriguez, and Dr. Malcolm W. Marks.
No. 2004-CA-0688.
Court of Appeal of Louisiana, Fourth Circuit.
May 9, 2007.
Rehearing Denied June 20, 2007.
*88 Robert G. Harvey, Sr., New Orleans, LA, for Plaintiff/Appellee.
Stewart E. Niles, Jr., Michelle A. Bourque, Niles, Bourque & Fontana, L.L.C., New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY).
MICHAEL E. KIRBY, Judge.
Defendant/Appellant, Raoul Rodriguez, M.D. appeals a Civil District Court Judgment of February 2, 2004 awarding the plaintiff, Ms. Jessie Mae Brown, general damages in the amount of $75,000 and medical costs associated with the injuries sustained as a result of Dr. Rodriquez's negligent follow-up care.
On September 16, 1985, the plaintiff in this matter, Ms. Jesse Mae Brown, was in a motorcycle accident that dislocated her left knee. Subsequent to the accident Ms. Brown was admitted to the emergency room at Hotel Dieu Hospital, whereupon she was evaluated and referred to Dr. Rodriguez. Following the advice she received at the Hospital, Ms. Brown sought medical treatment at Tulane Medical Center, where on September 17, 1985, Dr. Rodriguez treated her. In Dr. Rodriguez's pre-operative report he noted rotary instability of the left anteromedial knee. Ms. Brown's left knee had suffered significant structural damage to the ligament complex of the left knee joint.
Dr. Rodriguez performed surgery to repair her knee. The procedures were a left knee arthotomy, a medial and lateral meniscus repair, a repair of the tibial collateral ligament, a repair of the posterior oblique ligament, the removal of a torn anterior cruciate ligament (ACL) and an anti-lateral augmentation of the iliotibial band.
Following the surgery, Dr. Rodriguez placed Ms. Brown's leg in a fiberglass[1] cast. She was discharged from the hospital on September 21, 1985, four days after surgery. Dr. Rodriguez administered post-operative care on an out patient basis.
On October 1, 1985, the cast covering the sutures was removed and Dr. Rodriguez noted that he found a blister at the wound site on the medial part of her knee. Dr. Rodriguez treated the blister by debridement and placed a new cast on the plaintiff. On October 22, 1985 the plaintiff *89 visited with Dr. Rodriguez for another post-operative treatment. On this date Dr. Rodriguez's patient notes reflect a good post-operative course. The cast was not removed or changed on this date.
Ms. Brown then followed with her third post-operative treatment on November 5, 1985. During this treatment Dr. Rodriguez removed the cast and examined her leg. He noticed in the place of the blister an area of skin slough around the medial side of the knee. He treated the area by surgically removing the damaged tissue and advised the plaintiff to return to his office in two days.
On November 7, 1985 the plaintiff returned to Dr. Rodriguez's office for further debridement treatment. About this time she was admitted to the hospital for a skin necrosis because the skin slough remained present.
In a second surgery, Dr. Marks, a plastic surgeon, with Dr. Rodriguez's assistance, attempted to remove the necrotic tissue of the skin slough and cover the area with a skin graft. This second surgery caused additional scarring because more incisions were made. On November 12, 1985, blistering was noticed on the skin flap over the knee. Apparently the graft itself had problems and became necrotic.
On November 21, 1985, a third surgery was performed. The plaintiff underwent another treatment whereby a gastrocnemius (calf) muscle flap from the lower leg was transferred to the knee area. This was accomplished by making yet another incision around her calf muscle to move it. This use of the calf is the recommended surgical technique to help provide soft tissue coverage of exposed tendons, ligaments, and bone, in and around the knee joint. Ms. Brown was then discharged from the hospital on November 28, 1985.
Although the plaintiff does not allege any malpractice regarding the procedure she underwent immediately following the motorcycle accident injury, she does allege malpractice with her post-operative treatment. Specifically, the plaintiff contends that Dr. Rodriguez either placed the lateral and medial incisions too close, causing the death of the skin and the necessity of skin grafts; or that Dr. Rodriguez failed to follow proper protocol after noting the blister at the wound site, thereby permitting the skin to die and creating the need for the skin graft.
The plaintiff brought suit, and on February 2, 2004 the trial court ruled in her favor. Specifically, the trial court found that Dr. Rodriguez could have been more vigilant in managing the plaintiff's wound. The trial court stated that Dr. Rodriguez noticed the presence of a blister, was put on notice that the wound was not healing well, and he therefore should have periodically removed the plaintiff's cast to inspect plaintiff's wound. Plainly, the trial court found that Dr. Rodriguez should have viewed the blistered site more often than he initially did because he was put on notice that the wound was not healing normally. It was this failure, the trial court found, that led to a breach of the standard of care. The trial court awarded $75,000 in general damages to the plaintiff and reimbursement for medical expenses necessitated by Dr. Rodriguez's deviation from the standard of care.
Appellant asserts seven assignments of error. Specifically, he contends that the trial court erred because the record contains no expert testimony to support the court's conclusion that the standard of care for an orthopedic surgeon in 1985 required Dr. Rodriguez to periodically remove the plaintiff's leg cast. Also, the defendant claims that the trial court erred because the plaintiff did not provide evidence that *90 periodic removal of her leg cast would have prevented the blistering, skin slough, skin graft, and eventual scarring. Finally, the defendant asserts that the trial court erred in awarding medical expenses for cosmetic scarring that could have not been prevented, and further asserts that the award was in excess of a judgment limiting the defendant' liability to $100,000.
STANDARD OF REVIEW
In Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646, the Louisiana Supreme Court reiterated that the standard of review for factual findings in medical malpractice cases is the manifest error or the clearly wrong standard. In other words, in order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Rulings on law receive de novo review. A crucial mixed question of fact and law in this case was the etiology of the necrosis, the determination of which affects the standard of care. In layman's terms, the lack of blood supply caused the necrosis, but there was conflicting testimony concerning what caused the October 1, 1985 blister initially, this in turn affected whether the blister put Dr. Rodriguez on notice as to whether there was an avascular condition.
DISCUSSION
La. R.S. 9:2794 A. The state's medical malpractice statute, in pertinent part states:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
To help prove these elements by a preponderance of evidence, expert testimony is used. This testimony by a medical professional helps guide the court in determining whether the physician possesses the requisite skill or knowledge or whether he exercised reasonable care or diligence. Broussard v. Andersson, XXXX-XXXX, p. 5 (La.App. 4 Cir. 11/30/05), 921 So.2d 128, 132. An absence of expert testimony that the physician breached the proper standard of care precludes a finding of liability for medical malpractice. Peters v. ABC Ins. Co., 552 So.2d 430, 434 (La.App. 4th Cir.1989).
Dr. Peter Indelicato, the plaintiff's orthopedic surgeon expert, testified by deposition that Dr. Rodriguez breached the standard of care in two ways: first, in the placement of the incisions too close together *91 during the first surgery; and second, in the post-operative treatment of Ms. Brown. The trial court rejected this first contention, and determined that Dr. Rodriguez did not deviate from the standard of care during the operation. Since the first basis mentioned has not been appealed, we will solely address the second. Dr. Indelicato's rationale for finding breach of the standard of care in Dr. Rodriguez's post-operative care was that the positioning of the incisions so close together increased the risk of necrosis occurring between them. He stated that Dr. Rodriguez should have had a heightened concern regarding the potential of complications arising because of the location of the incisions in relation to one another. He went on to state that he would have placed a window in the cast or taken some other measure to ensure easy visible access and inspection of this area. On cross examination, Dr. Indelicato admitted he could not cite any published study in medical literature that supported his contention that an incision should be four (4) to six (6) inches apart between the medial parapatellar incision and a lateral parapatellar incision.
We have thoroughly reviewed the record herein and could not find a preponderance of evidence to establish that the standard to which Dr. Indelicato testified was the standard at the time of this surgery, much less the standard for all orthopedic surgeons. Thus, the plaintiff did not meet her burden of proof on this issue and the trial court properly found the same.
Dr. Glenn Terry, one of defendant's experts, on direct examination testified that Dr. Rodriguez's September 17, 1985 incisions were to a reasonable medical probability located in accord with directives of national programs concerning placement of incisions for similar injuries. He stated that Dr. Rodriguez's post-operative care was within the prevailing standard of care at that time because his diagnosis of the genesis of the problem differed from that of Dr. Indelicato. However, on cross examination, Dr. Terry admitted that he would have changed the original cast sooner, as opposed to the length of time Dr. Rodriguez left it in place. Nevertheless, he qualified that response by stating that the ligaments do better from not changing the cast. There was no expert testimony that the prevailing standard of care requires orthopedic surgeons to fit patients such as Ms. Brown with a cast with a window to view a blistered area.
Dr. Terry stated that in his opinion the blistering and subsequent necrosis was caused not by the situs of the incisions, but rather from a neurohormonal response[2] that caused skin swelling/edema in the skin that precipitated venous insufficiency. He explained that skin swelling can cause a deprivation of the blood supply. Dr. Terry testified that he was of the opinion that the initial blister Dr. Rodriguez found was caused by swelling of the skin, akin to a shoe that is too tight thereby creating a condition in which the epidermis does not receive the blood supply it needs. Thus, he did not look askance at Dr. Rodriguez identifying the October 1, 1985 blister as a normal response and to simply treat the blister and replace the cast on Ms. Brown's leg. Dr. Terry bolstered his opinion by citing Ms. Brown's physical therapy notes, which indicated ongoing difficulty with pain when passive motion therapy was applied. He correlated this pain with an abnormal sympathetic nerve response.
Moreover, Dr. Terry testified that the consequences of not having the knee surgery done would have resulted in chronic *92 instability, a severely arthritic condition in the knee and irreversible damage to the articular cartilage. These conditions would have necessitated a fusion of the knee or a future total knee replacement. Finally, alluding to Dr. Indelicato's testimony, Dr. Terry stated he would not treat his diagnosis of Ms. Brown's condition with a window in the cast, but rather with a uniform compression under the cast.
Dr. Terry Habig, a member of the medical review panel and expert for the defense, testified extensively about the tremendous trauma, to Ms. Brown's knee sustained in the motorcycle accident. He also stated that because the knee was swollen due to the traumatic condition, the distance between Dr. Rodriguez's incisions would be most likely even wider than 6 centimeters. He stated that a culture taken on November 19, 1985, revealed that the patient had staph epidermis, but was otherwise negative for any anaerobic or aerobic bacteria. This he said was normal, as he explained that while a staph is a contaminant he would not consider it an infection.
Plaintiff presented witnesses who testified to a foul odor emitting from the cast. This alleged condition was not memorialized in any of Dr. Rodriguez's notes. The trial court placed great weight on this testimony in finding that the post-operative care left much to be desired of uncharacteristic odors. However, there was no testimony that the plaintiff's outcome would have been any different had the slough been discovered any sooner as a result of the alleged odor. She still would have needed the same treatments.
Because of the lack of expert testimony showing by a preponderance of the evidence that Dr. Rodriguez deviated from the standard of care provided to Ms. Brown in the post-operative treatment, we find the trial court erred in its determination that Dr. Rodriguez breached the standard of care in his post operative treatment of plaintiff.
Additionally, appellant asserts that the plaintiff failed to provide evidence that periodic removal of the leg cast would have prevented the blistering from occurring. A physician's duty is to exercise the degree of skill ordinarily possessed by his professional peers. Soteropulos v. Schmidt, 556 So.2d 276, 277 (La.App. 4th Cir.1990). Further, the mere fact that an injury occurred, specifically the blistering on Ms. Brown's leg, raises no presumption or inference of negligence. Galloway v. Baton Rouge General Hosp., 602 So.2d 1003, 1008 (La.1992). Although the trial court states that Dr. Rodriguez should have been more vigilant in caring for the blistered area, specifically by removing the cast more frequently, there was no preponderance of evidence provided by the plaintiff that this would have prevented the blistering and skin injury.
In order to find that Dr. Rodriguez failed to prevent the blistering because he was not more vigilant in his post-operative care of Ms. Brown, the plaintiff must have submitted evidence or testimony of his alleged deviation and the causation of this deviation. La.R.S. 9:2794 A. Our review of the record reveals a lack of evidence and testimony proving that more vigilant care could have prevented the blistering from occurring. Stated another way, there was testimony that there were alternative causes of the skin slough and necrosis. These alternative causes, such as venous insufficiency, could have been related to the initial trauma suffered as opposed to the surgery. For these factual and medical reasons, it was not appropriate to apply the doctrine of res ipsa loquitur.
We find that the trial court erred in finding that Dr. Rodriguez was guilty of *93 malpractice because he should have been more vigilant in his post-operative treatment of Ms. Brown. The preponderance of the evidence in the record is in favor of the cause being an abnormal sympathetic nerve response that led to venous insufficiency. Since there was not sufficient testimony or evidence provided that Dr. Rodriguez failed to use reasonable care in his post-operative treatment of the plaintiff, and that his failure led to subsequent skin injuries, we reverse the ruling of the trial court.
Finally, the defendant asserts the trial court erred in its award of damages; however, because of the plaintiff's failure to provide adequate evidence to support the medical malpractice claim any issue regarding the alleged award is moot.
CONCLUSION
For the aforementioned reasons, we reverse the judgment of the trial court and render judgment in favor of the defendant dismissing plaintiff's suit at her cost.
REVERSED.
NOTES
[1] We note that both defense experts stated different casts were placed. Dr. Terry stated a fiberglass cast was used while Dr. Habig stated a plaster cast was used.
[2] Dr. Terry defined a neurohormonal response as one in which the injury creates a trangidate of juice that is inflammatory and incites a healing response.