972 So.2d 369 (2007)
Ms. Brenda FRANKLIN, Individually and on Behalf of her Minor Daughter, Shaylon Day.
v.
The TULANE UNIVERSITY HOSPITAL AND CLINIC, and Dr. Franklin G. Boineau, III, M.D., Dr. Olugbenga A. Akingbola and The Administrators of the Tulane Educational Fund, d/b/a Tulane University Health Sciences Center, et al.
No. 2006-CA-1557.
Court of Appeal of Louisiana, Fourth Circuit.
November 21, 2007.
Dr. Edward A. Robinson, III, Dr. Mark Edward Robinson, Law Offices of Dr. Edward A. Robinson, III, Baton Rouge, LA, *370 for Appellants, Ms. Brenda Franklin Individually and on Behalf of her Minor Daughter, Shaylon Day.
Stewart E. Niles, Jr., Karen M. Fontana, Niles, Bourque & Fontana, L.L.C., New Orleans, LA, for appellees, Dr. Franklin G. Boineau, III, Dr. Olugbenga Akingbola and The Administrators of the Tulane Educational Fund.
Peter E. Sperling, A. Jacob Culotta, Jr., Frilot Partridge, L.C., New Orleans, LA, for Appellee, Tulane University Hospital and Clinic.
(Court composed of Judge JAMES F. McKAY, III, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
The, plaintiffs, Ms. Brenda Franklin, individually and on behalf of her minor daughter, Shaylon Day, appeal two district court judgments dismissing their medical malpractice claims against the defendants, Dr. Franklin G. Boineau, III, Dr. Olugbenga A. Akingbola, the Administrators of the Tulane Educational Fund d/b/a Tulane University Health Sciences Center ("Tulane Medical School"), and Tulane University Hospital and Clinic ("Tulane Hospital").[1] We affirm the judgments of the trial court.

FACTS AND PROCEDURAL HISTORY
Shaylon Day, a seven-year-old girl, was admitted to Baton Rouge General Medical Center ("Baton Rouge General") on March 26, 2000, by her pediatrician, Dr. Rodger H. Elofson, II, for persistent abdominal pain with diarrhea, vomiting, dehydration and fever after she failed to respond to outpatient treatment with antibiotics. Upon admission, Shaylon had high fever, low blood pressure, and a rapid heart rate. Her urine output was minimal, indicating possible renal failure. Shortly after her admission to Baton Rouge General, Shaylon's BUN/creatinine[2] levels increased rapidly despite her being administered fluids intravenously. The urinalysis and lab work confirmed progressing renal failure. Due to Shaylon's deteriorating condition, Dr. Elofson consulted with Dr. Boineau, a pediatric nephrologist[3] at Tulane Hospital in New Orleans. Based on the information provided to him, Dr. Boineau believed Shaylon's condition included interstitial nephritis (a kidney disorder) and advised Dr. Elofson to transfer her to Tulane Hospital's Pediatric Intensive Care Unit (PICU).
Shaylon arrived at Tulane Hospital at 3:00 a.m. on March 28, 2000, was admitted directly to the PICU, and placed under the care of Dr. Boineau and Dr. Akingbola, a pediatric critical care specialist. Upon arrival, she was found to be dehydrated, hypotensive (low blood pressure) and in shock. An abdominal ultrasound revealed fluid in Shaylon's pelvic region. After further examination, the doctors made a diagnosis *371 of a possible ruptured appendix in addition to acute renal failure. Shaylon continued to be fluid resuscitated and slowly developed an excessive amount of fluid in her lungs.
At midnight on March 29, 2000, Shaylon was placed on an oxygen mask to assist her breathing. Dr. Robert Hopkins, a pediatric critical care specialist, monitored Shaylon's condition through the night and into the morning. At 9:30 a.m., Shaylon had an extremely rapid heart rate and her urine output had decreased significantly, indicating acute respiratory failure as a result of the fluid accumulation in her lungs. At that time, Dr. Hopkins elected to intubate Shaylon with an endotracheal tube and consulted with Dr. Usha Ramadhyani, a Tulane Medical School pediatric anesthesiologist, who successfully performed the intubation. Approximately thirty minutes after the intubation, Shaylon suffered a cardiac arrest and a code[4] was called. The medical staff began cardio pulmonary resuscitation, an epinephrine[5] drip was started, and Shaylon was placed on mechanical ventilation. Although Shaylon was resuscitated from the code, she experienced multiple seizures several hours later.
On April 3, 2000, Dr. John Willis, a pediatric neurologist, examined Shaylon and had her undergo a CT scan[6], which disclosed that she had suffered extreme brain damage due to a deprivation of blood and oxygen to her brain. On April 10, 2000, Shaylon's endotracheal tube was removed, but it had to be reinserted two days later due to respiratory failure. Shortly thereafter, Shaylon underwent a tracheostomy under general anesthesia for long-term ventilation.[7] Shaylon's neurological status was unchanged, and she remained in a persistent vegetative state with little or no improvement anticipated. As a result of her condition, she was transferred from PICU to a regular hospital room on May 3, 2000, and was subsequently discharged.
On February 8, 2001, a complaint was filed with the Patient's Compensation Fund pursuant to the Louisiana Medical Malpractice Act, La.R.S. 40:1299.41 et seq., to request that a medical review panel be convened to consider the care rendered by Baton Rouge General and Dr. Elofson. On November 1, 2002, the complaint was amended to ask the medical review panel to also consider the actions of Tulane Medical School, Tulane Hospital, Dr. Boineau and Dr. Akingbola.
In a decision dated December 6, 2004, the medical review panel unanimously found that the evidence did not support the conclusion that Tulane Hospital, Tulane Medical School, Dr. Boineau, Dr. Akingbola, or Dr. Elofson had breached the applicable standards of care as alleged in the complaint. However, the panel concluded that Baton Rouge General had breached the appropriate standard of care. Specifically, the medical review panel opinion stated:
[t]he panel finds that the Baton Rouge General deviated from the appropriate standard of care in that the child should have been admitted to a pediatric intensive *372 care unit. At the time of service, the Baton Rouge General did not have this level of care. The emergency room physician had an adequate amount of clinical information, i.e., the child's tachycardia [(rapid heart rate)], elevated BUN and elevated creatine (sic) to require intensive care. A second point is that once the child was admitted to the Baton Rouge General, there was an abrupt change in blood pressure noted by the nursing staff on the floor. The blood pressure was not communicated to any physician. This omission represents a potential beginning of the child's impending clinical deterioration. This deviation from the standard of care caused a delay in getting the child appropriately hydrated and may have been the sentinel event, or definitely a combined factor in the child's outcome. This represents a serious downturn in the patient's condition and indicates an unstable patient, requiring PICU intervention where more aggressive fluid management and observation could be done. While this abrupt drop in blood pressure does not necessarily represent the actual damages, it does represent a serious state in the evolution of a septic shock picture and indicates that this child is very unstable and should be cared for in a PICU setting, not a general admission floor. Further, the failure of a nurse to communicate this change in patient status is a major breach of nursing care standards.
Despite the medical review panel opinion, on February 22, 2005, the plaintiffs filed a petition alleging medical malpractice against the defendants herein as well as Baton Rouge General and Dr. Elofson. The defendants filed an answer, denying the plaintiffs' allegations and asserting as an affirmative defense the opinion of the medical review panel. In connection with the suit, the defendants propounded discovery to the plaintiffs specifically requesting that they identify any and all witnesses who may testify at trial that the defendants breached the applicable standards of care. In response, the plaintiffs provided the name of Dr. Steven Palder, a pediatric general surgeon, and Dr. Mickey Viator, a pediatrician and an emergency room physician.
Dr. Palder testified at his deposition on April 28, 2006, that he was initially retained by the plaintiffs' first attorney in 2000 and, based on the information provided to him at that time, he believed the defendants had deviated from the applicable standards of care. However, upon a later review of Shaylon's complete medical records from Tulane Hospital, Dr. Palder recanted his opinions as to Dr. Akingbola, Dr. Boineau, and Tulane Medical School. He specifically stated:
When I initially looked at the chart, I felt that was (sic) child's care at Tulane deviated from the standard of care. But when I looked at the chart with what I had, I have to recant that. I think that the standard of care at Tulane was within the realms of what was okay. It could have been different from what I would have done, but that doesn't necessarily mean that it deviated from the standard of care. So my rereading of the chart changed my opinion with regard to Tulane and the doctors at Tulane.
Dr. Palder explained further:
What [the Tulane Medical School doctors] did was they were faced with a child who  they apparently felt they couldn't hydrate her fast enough. She was at the point where if they didn't do something in addition to hydration, they were going to  she was going to code. When you have a blood pressure of 50 over 30, you don't have much leeway. *373 When you have a blood pressure of 77 over 44, you have a little more reserve. And so for these doctors at Tulane, they had little reserve and they put her on vasoactive [(relating to blood vessels)] agents, dopamine and epinephrine.
It turns out they needed that. They couldn't take the epinephrine off until the 1st of April. And they couldn't take the dopamine off  they weaned it down on the 2nd and stopped it on the 7th.
So it's interesting, because on the 28th when she was transferred into Tulane at 10:00, she was seen by Dr. Boineau. And at that point he felt that the patient's renal failure was due to poor profusion. He thought she had a diagnosis of ruptured appendicitis. That's never been proved or disproved. But he agreed that she was poorly profused and that hydration was what needed to be done.
And I didn't have some of that information, I believe the first time. But the first time was five years, six years ago.
As to the actions of the nurses and other medical staff employees of Tulane Hospital, Dr. Palder testified that he found no deviation from the acceptable standard of care.
The plaintiffs' other pediatric expert, Dr. Mickey Viator, also testified that Dr. Akingbola, Dr. Boineau, Tulane Medical School, and the nurses and staff at Tulane Hospital had complied with all the prevailing standards of care.
Based on the favorable opinion of the medical review panel and the deposition testimony of Drs. Palder and Viator, the defendants filed motions for summary judgment, seeking the dismissal of the plaintiffs' medical malpractice claims against them. The defendants argued that the plaintiffs cannot satisfy their burden of proof at trial considering the lack of any expert testimony from a qualified witness that the defendants had breached the applicable standards of care.
In opposition to the motion, the plaintiffs submitted an affidavit from Dr. Carl Warren Adams, a board certified cardiothoracic surgeon and surgical critical care specialist, from Pueblo, Colorado. Dr. Adams averred that based on his review of Shaylon's medical records from Baton Rouge General and Tulane Hospital, he concluded that the defendants' treatment of Shaylon had departed from the acceptable standards of care. Specifically he found that Dr. Boineau and Dr. Akingbola failed to place central or right heart pressure monitoring devices to appropriately treat Shaylon's intravascular volume status; failed to make the appropriate diagnosis of the cause of Shaylon's continued sepsis and cardiogenic shock; and, failed to treat the renal failure appropriately with volume expansion rather than vasoactive and potentially contraindicated pressor support. He also found that Dr. Boineau and Dr. Akingbola as well as the staff at Tulane Hospital failed to perform the "elective" intubation in a safe and controlled environment.
At the hearing on the motion for summary judgment, the defendants argued that the submission of Dr. Adams' affidavit was insufficient to satisfy the plaintiffs' burden of proof at trial because Dr. Adams, a cardiothoracic surgeon, was not qualified as an expert in the areas of pediatric nephrology or pediatric critical care as required under La. R.S. 9:2794. To counter Dr. Adams' affidavit, the defendants introduced into evidence the sworn deposition testimony of Dr. Adams from three other medical malpractice cases which set forth his training and experience as a cardiothoracic surgeon who treated adult patients. Following the hearing, the trial court granted the defendants' motions for summary judgment and dismissed *374 the plaintiffs' medical malpractice claims against them.[8]

STANDARD OF REVIEW
The proper standard of review for an appellate court considering summary judgment is de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Reynolds v. Select Properties Ltd., 93-1480, p. 1 (La.4/11/94), 634 So.2d 1180, 1182; See also Indep. Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257, p. 7 (La.2/29/00), 755 So.2d 226, 230. A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits submitted, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2). The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). La. C.C.P. art. 966(C)(2) provides, in pertinent part:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. [Emphasis added.]

ASSIGNMENTS OF ERROR
The plaintiffs raise five assignments of error. The gist of the first, second, and third assignments of error is that the trial court erred in granting the defendants' motions for summary judgment. The fourth assignment of error asserts that the trial court denied the plaintiff due process of law by usurping the function of the jury, which is to weigh the opinions of the experts and determine whether the plaintiffs met their burden of proving causation. In the fifth assignment of error, the plaintiffs argue that the trial court erred in failing to apply La. C.E. art. 702.[9]

LAW AND DISCUSSION
The plaintiffs burden of proof in a medical malpractice action is statutorily established. Pursuant to La. R.S. 9:2794 A(1)(3), a plaintiff in a malpractice action against a physician must prove:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed *375 to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
In Broussard v. Andersson, 05-0006, p. 6 (La.App. 4 Cir. 11/03/05), 921 So.2d 128, 132, this Court stated that "[t]o determine whether a physician possesses the requisite degree of knowledge or skill or whether he exercised reasonable care or diligence, the court is guided by expert witnesses who are members of the medical profession. . . ." Further, "[w]here the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care." 05-0006, pp. 6-7, 921 So.2d at 132. This Court also stated that "[t]he jurisprudence has recognized that `an expert witness is generally necessary as a matter of law to prove a medical malpractice claim.'" Id., citing Williams v. Metro Home Health Care Agency, Inc., 02-0534, p. 5 (La.App. 4 Cir. 5/8/02), 817 So.2d 1224, 1228.
There are, however, some situations where the jurisprudence has recognized that expert testimony is not required to meet the plaintiff's burden of proof in a medical malpractice case. Pfiffner v. Correa, 94-0924, 94-0963, and 94-0992 (La.10/17/94), 643 So.2d 1228, 1230. In the Pfiffner case the Louisiana Supreme Court explained that a plaintiff in a medical malpractice case could prevail regarding the appropriate standard of care if a layperson could infer negligence from the facts presented at trial. 94-0924, 94-0963, and 94-0992, p. 1, 643 So.2d at 1230. The Supreme Court stated that "[e]xpert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body." 94-0924, 94-0963, and 94-0992, p. 9, 643 So.2d at 1233.
This Court in Pierre-Ancar v. Browne-McHardy Clinic, 00-2409, 00-2410 (La. App. 4 Cir. 11/16/02), 807 So.2d 344, 348, stated that with a few exceptions, such as those described in the Pfiffner case, "because of the complex medical and factual issues involved in medical malpractice cases, a plaintiff will likely fail to sustain his or her burden of proving his or her claim under La. R.S. 9:2794 without medical experts."
In the instant case, the alleged malpractice was not the type of malpractice that was described in the Pfiffner case from which a layperson could infer negligence without the benefit of expert testimony. Here, the case involved the treatment of a critically ill seven-year-old child with acute renal failure, sepsis, dehydration, possible appendicitis, and respiratory failure, which required surgical intervention during her hospitalization. Moreover, it is undisputed that Shaylon was transferred from Baton Rouge General to the PICU at Tulane Hospital because Dr. Elofson and Baton Rouge General were *376 not equipped or trained to provide the necessary, specialized treatment for the child.
In support of their motion for summary judgment, the defendants offered the opinion of the medical review panel as well as the deposition testimony of Drs. Palder and Viator that stated the defendants did not breach the applicable standards of care. Thus, to avoid having the summary judgment granted in favor of the defendants, the plaintiffs were required to produce factual support sufficient to establish that they would be able to satisfy their evidentiary burden of proof at trial. Specifically, they had to submit evidence in the form of deposition testimony or an affidavit from a physician specializing in pediatric nephrology and/or pediatric critical care that opined Drs. Boineau and Akingbola and the staff at Tulane Hospital had breached the applicable standards of care in their treatment of Shaylon.
In opining that the defendants breached the applicable standard of care, the plaintiffs' expert, Dr. Adams, admits in his affidavit that there are differences in fluid management between children and adults. However, nowhere does he aver that he has done a residency or fellowship or received any training in pediatrics, much less pediatric critical care or pediatric nephrology. Absent any evidence to indicate Dr. Adams is qualified to render an expert opinion regarding pediatric nephrology or pediatric critical care, the plaintiffs cannot satisfy their burden of proof as required by La. R.S. 9:2794 A. Thus, we find the trial judge was correct in rendering summary judgment as a matter of law in favor of the defendants and dismissing the plaintiffs' medical malpractice claims.
In view of our conclusion that the plaintiffs will not be able to meet their burden of proving a breach in the applicable standards of care, we need not consider the plaintiffs' fourth and fifth assignments of error relative to the trial court's determining the admissibility of and weight given to expert testimony.

DECREE
Accordingly, for the reasons set forth above, we affirm the judgments of the trial court rendered in favor of the defendants, dismissing the plaintiffs' medical malpractice claims against them.
AFFIRMED.
NOTES
[1] The Administrators of the Tulane Educational Fund d/b/a Tulane University Health Sciences Center is a separate and distinct entity from the Tulane University Hospital and Clinic, which is owned and operated by University Healthcare System L.C.
[2] BUN or blood urea nitrogen is a metabolic by product of the liver from the breakdown of blood, muscle and protein. Abnormal elevation in the BUN level can indicate renal disease, dehydration, congestive heart failure, gastrointestinal bleeding, starvation, shock, or a urinary tract obstruction.

Creatinine is a waste product of protein metabolism that is found in the urine. An abnormally elevated blood creatinine level is common in individuals with kidney failure.
[3] A nephrologist is a specialist in the treatment of kidney insufficiency and kidney disease.
[4] A "code" is a signal indicating a life threatening, emergency situation.
[5] Epinephrine is an adrenal hormone used medicinally as a cardiac stimulant for the treatment of abnormally low or absent blood pressure.
[6] A computed tomography scan is a special radiographic technique that uses a computer to assimilate multiple x-ray images into a two dimensional cross-section image.
[7] A tracheostomy is the surgical creation of an artificial airway in the trachea (windpipe) on the front of the neck.
[8] The appeal record contains neither a transcript of the hearing on the motion for summary judgment nor written reasons for judgment from the trial court. However, at the oral argument in this case, the attorneys acknowledged that the trial judge concluded that Dr. Adams, an adult heart surgeon, was not qualified to render an opinion on pediatric nephrology or pediatric critical care.
[9] La. C.E. art. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.